## COLORADO CONTINENTAL LUMBER CO. v. UNITED STATES.

No. H-388.

Court of Claims.

June 16, 1930.

In this suit plaintiff seeks to recover $2,-631.67 alleged to represent tax and interest overpaid for 1918, $1,398.31, tax and interest overpaid for 1919, and $1,760.51, tax and interest overpaid for 1920, together with interest on the amounts from the dates of payment thereof as provided by law.

At the time the suit was instituted, plaintiff based its claim for judgment upon the refusal of the Commissioner of Internal Revenue to compute its profits tax under the special assessment provisions of the Revenue Act of 1918, or, in the alternative, to be permitted to include in its invested capital for the taxable year as a paid-in surplus an alleged value of good will coming to it upon organization in the form of a right to sell the lumber products in certain territory of the Continental Tie & Lumber Company and as the result of the acquisition of certain selling agreements of the Minnequa Lumber Company which it is alleged were paid in to it by its stockholders.

The claim of special assessment was eliminated from the case by the decision in Williamsport Wire Rope Co. v. United States, 277 U. S. 551, 48 S. Ct. 587, 72 L. Ed. 985.

Defendant contends that plaintiff is not entitled to recover, first, because the intangible asset, good will, may not be included in invested capital as a paid-in surplus, and, secondly, because the suit is based on a ground which was not made the subject of a claim for refund.

### Special Findings of Fact.

1. Plaintiff, a Colorado corporation, was organized in 1910 and has its principal office at Denver. Since that time it has been continuously engaged in selling lumber and sawmill products at wholesale on a commission basis and on its own account for profit.

Prior to incorporation of plaintiff, and since about 1905, there had been in existence a corporation known as the Continental Tie & Lumber Company, hereinafter sometimes referred to as the "Continental Company," which was engaged in the lumber industry with its principal place of business in the northern part of New Mexico on the Atchison, Topeka & Santa Fé Railroad and the Cimarron & Northwestern Railway; the entire capital stock of the latter company being held by the Continental Company. The market for the lumber products of the Con-

tinental Company was along the Atchison, Topeka & Santa Fé Railroad and connecting lines to the north and east of the Continental Company's plant, in the states of Colorado, Wyoming, Kansas, and Oklahoma, and, occasionally, into Illinois. There were no lumber mills located on the Santa Fé Railroad farther east than the Continental Company. There were other lumber companies manufacturing the same kind of product as that of the Continental Company farther west and southwest than this company, and their products were sold chiefly in the same market as that of the Continental Company, but their freight rates were higher, which gave the Continental Company an advantage in the sale of lumber in this territory. The relation between the Continental Company and the Santa Fé Railroad was very close, in that the development of the timber franchises held by the Continental Company gave the Santa Fé Railroad additional tonnage, and the Cimarron & Northwestern Railway referred to was constructed on inducements of the predecessor of the Atchison, Topeka & Santa Fé Railroad, the St. Louis, Rocky Mountain & Pacific Railway, which was later on taken over by the Santa Fé, together with agreements regarding freight rates and divisions of rates to the Cimarron & Northwestern Railroad.

The timber holdings of the Continental Company consisted of the exclusive right to cut the timber of the Maxwell land grant at the time of its organization in 1905, containing 1,500,000 acres, of which a considerable portion was timbered.

2. T. A. Schomburg had been in the lumber business for about 40 years, having been connected with five corporations prior to the organization of the Continental Company in 1905, of which corporation he was president and owned more than three-fourths of its capital stock.

3. For about three years prior to 1910 a corporation known as the Minnequa Lumber Company was engaged in the sale of lumber at wholesale and retail and had a number of retail lumber yards in southern Colorado. This corporation for three years prior to the organization of plaintiff had acted as sales agent for the Continental Company for all lumber products by the latter company for the states of Colorado, Wyoming, Nebraska, Kansas, and Oklahoma; the Continental Company being engaged exclusively in manufacturing and the Minnequa Company being engaged exclusively in selling at wholesale and retail, receiving a commission upon

the sales of lumber produced by the Continental Company. The total sales made by the Minnequa Company of lumber produced by the Continental Company for 1909 and 1910 amounted to $242,000 for the two years. Schomburg was not a stockholder of the Minnequa Lumber Company. Charles E. Bullen was a stockholder in the Minnequa Company and had charge of its wholesale department.

4. In 1910, at a conference regarding the selling of lumber, Bullen approached Schomburg with reference to the formation of a selling company, suggesting that the Continental Company authorize such proposed corporation to act as the sales agent for its products that had theretofore been sold by the Minnequa Company and that the proposed selling corporation also acquire from the Minnequa Company other selling agreements which the latter company had with mills in the Northwest.

Schomburg and Bullen further discussed the field as to the advantage of organizing a new selling company. As a result, the Colorado Continental Lumber Company, the plaintiff herein, was organized for the purposes set forth above.

5. At incorporation its entire capital stock was of a par value of $25,000, the entire amount of which was issued one half to C. E. Bullen and the other half, including a single qualifying share issued in the name of H. K. Holloway, was issued to T. A. Schomburg for $25,000 in cash. The Continental Company paid the $12,500 for one-half of the stock of plaintiff issued to Schomburg and thereafter he held the stock and the dividends thereon as nominal owner.

6. Upon incorporation of plaintiff the Continental Company discontinued its arrangement with the Minnequa Company and made plaintiff its sales agent on the basis of a 5 per cent. commission on sales of its products in the territory granted, and agreed to grant plaintiff a discount of 2 per cent. for cash in 10 days in respect of sales of lumber, lath, molding, and patterns. The plaintiff also acquired from the Minnequa Company the selling agreements which it had with other mills in the Northwest. Thereafter, the wholesale department of the Minnequa Company was discontinued.

Schomburg and Bullen were the principal officers and were directors of plaintiff, and were employed by it to sell its product. Bullen devoted a greater portion if not his entire time to the business of plaintiff. From the start plaintiff paid Bullen a salary of

$300 a month. During the first two or three years plaintiff paid no salary to Schomburg. Thereafter it paid him a salary, the amount of which is not shown. Prior to the organization of plaintiff Bullen was a minority stockholder and a salaried official in charge of the wholesale department of the Minnequa Company. He had become familiar with lumber trade and knew the customers of the Minnequa Company.

No cash was paid by plaintiff to the Continental Company for the privilege of acting as its sales agent. Nor did plaintiff pay any amount to the Minnequa Company for the selling agreements which it acquired from that corporation. As a result of the Continental Company making plaintiff its sales agent and the acquisition by the plaintiff of sales agreements from the Minnequa Company and its employment of Schomburg and Bullen, plaintiff commenced business with an established trade. At the time of incorporation Schomburg and Bullen "estimated" that the net earnings of the plaintiff would be at least $10,000 a year. No entries have ever been made on the books of account of plaintiff for any intangible asset. During the first six years of plaintiff's existence its profits were $8,365.98 for 1911, $13,479.46 for 1912, $8,721.97 for 1913, $11,302.67 for 1914, $9,995.84 for 1915, and $18,606.52 for 1916, making a total of $70,472.44.

7. Plaintiff filed its tax return for 1918 and paid the tax of $3,965.16. Subsequently, on October 27, 1922, the commissioner assessed an additional tax for this year of $4,015.68, which plaintiff paid, together with interest of $301.18. February 1, 1924, plaintiff filed with the collector at Denver a claim for refund on the form prepared by the Treasury Department, claiming a refund of $4,316.86, or such greater amount as might be legally refundable for 1918. The grounds stated in this claim for refund were as follows:

"This claim for refund is now filed for the reason that taxpayer contends that the excess-profits tax as computed on the basis of statutory invested capital is excessive, abnormal, oppressive, and far in excess of the average tax paid by similar corporations in the same line of business with the same 'capital employed'; for the reasons set forth in the original and amended returns on file and in the abatement claim already filed and in the correspondence and briefs filed with the Commissioner of Internal Revenue at Washington, D. C., and with the Committee on Appeals and Review; all of which documents are specifically referred to and made a part hereof.

"And for the further reason that taxpayer claims assessment under the provisions of sections 327 and 328 or under section 303 of the Revenue Act of 1918 (40 Stat. 1089, 1093).

"And for the further reason that when taxpayer's correct tax liability is determined upon the basis of statutory invested capital it will be shown that it has already overpaid its taxes in the sum of $931.05, together with interest thereon at the rate of 6% per annum for 15 months, $69.83; total amount, $1,000.88; all of which was paid under protest on October 28, 1922.

"And for the further reason and purpose of protecting taxpayer's rights in claiming interest under the provisions of section 1324 of the Revenue Act of 1921 (42 Stat. 316) at the rate of 6% per annum from October 28, 1922, upon such amount as may finally be determined to have been overpaid."

8. Upon consideration of plaintiff's claim for refund the commissioner denied its application for special assessment and determined its net income for 1918 to be $22,628.19; the invested capital to be $91,597.22; the excess-profits tax to be $5,198.19; and the total income and profits tax liability for the year to be $7,049.79. As a result of this decision the commissioner determined that there had been an overpayment of $931.05, which amount was duly refunded to plaintiff. The claim for refund was otherwise denied.

9. Plaintiff made its return for 1919 and paid a tax of $3,345.58. Subsequently, on October 23, 1922, the commissioner assessed an additional tax for this year of $1,702.89, which plaintiff paid, together with interest of $212.86. March 11, 1925, it filed with the collector a claim for refund on a form prepared by the Treasury Department demanding a refund of $5,048.47 for 1919, or such greater amount as might be legally refundable. The grounds of this claim for refund were that the plaintiff was entitled to classification as a personal-service corporation, or, in the alternative, that it was entitled to have its profits tax computed under the special-assessment provisions of sections 327 and 328 of the Revenue Act of 1918 (40 Stat. 1093).

Upon consideration of this claim the commissioner denied the claim for personal service classification, the application for special assessment, and determined the net income to be $23,937.77; the invested capital to be

$104,979.03; the profits tax to be $3,096.28; and the total income and profits tax liability to be $4,964.49. As a result of this decision the commissioner determined that there had been an overpayment of $83.98, which amount was duly refunded. The claim for refund was otherwise denied.

10. At the time plaintiff's claim for refund for 1918 was filed there was on file with the commissioner a claim for abatement in respect of the tax for 1919 in which plaintiff claimed that it was entitled to classification as a personal service corporation and a letter, dated June 14, 1923, addressed to the Commissioner of Internal Revenue, and signed by plaintiff's counsel and verified by T. A. Schomburg, in support of its claim for special assessment of its profits tax under the provisions of sections 327 and 328 of the Revenue Act of 1918 on appeal to the committee on appeals and review. In this letter plaintiff insisted in support of its claim for special assessment that it had a good will of $75,000 "which, under the law, it is not permitted to use in statutory invested capital."

11. Plaintiff filed its return for 1920 showing a tax of $6,199.15, of which amount $1,868.45 was paid on March 23, 1926, together with interest thereon of $475.15. Upon audit of this return the commissioner determined the net income to be $28,487.02; the invested capital to be $122,318.96; the profits tax to be $3,944.94; and the total income and profits tax liability to be $6,199.15.

March 30, 1926, plaintiff filed with the collector a claim on the form prepared by the Treasury Department demanding a refund of $2,000, or such greater amount as might be legally refundable, of the tax paid for 1920. The claim for refund for 1920 stated that there had been an understatement of invested capital by excluding dividends on Trinchera Timber Company stock; also by failing to take into account the nonpayment of the 1917 and 1918 taxes, which were paid after the taxable year 1920.

The claim for refund also claimed the right of special assessment under sections 327 and 328 of the Revenue Act of 1918. One of the reasons set forth in the claim in support of the right of special assessment was that the greater part of the income was due to good will, which the law did not permit to be included in invested capital. This claim for refund had not been acted upon by the commissioner at the time suit was instituted on October 1, 1927.

12. In determining the invested capital of plaintiff for each of the years 1918, 1919, and 1920, neither the plaintiff in its returns filed nor the Commissioner of Internal Revenue in his final determinations included in invested capital any amount as paid-in surplus as the cash value of good will, or other intangible asset.

13. In none of its claims for refund did plaintiff ask that any amount on account of intangibles be included in its invested capital, nor did it make any claim for refund on the ground that its profits tax should be decreased by increasing the invested capital by the inclusion therein of any alleged value of good will or other intangible. The specific ground stated in each of the refund claims, with the exception of the claim for refund for 1920 in which plaintiff claimed that its invested capital had been understated by including dividends on the stock of the Trinchera Timber Company and by failing to take into account the nonpayment of the 1917 and 1918 tax of plaintiff subsequent to 1920, was that plaintiff was entitled to a computation of its profits tax under sections 327 and 328 of the revenue act of 1918, and in its claims plaintiff did not preserve its right to a refund for any other reason.

14. There is no satisfactory proof of the cash value of the good will, if any, acquired by it.

Geo. E. H. Goodner, of Washington, D. C. (Paul D. Banning, of Washington, D. C., on the brief), for plaintiff.

Geo. H. Foster, of Washington, D. C., and Herman J. Galloway, Asst. Atty. Gen., for the United States.

Before BOOTH, Chief Justice, and GREEN, LITTLETON, and WILLIAMS, Judges.

LITTLETON, Judge.

Plaintiff insists that it has a right to maintain this suit and to have the court determine its right to include in invested capital, as a paid-in surplus, the alleged cash value of good will, on the ground that, although it did not make the inclusion in invested capital of good will a specific ground for its claim for refund, it was the duty of the commissioner to decide the case upon the facts before him, and that plaintiff had filed with the commissioner certain documents in which it claimed a substantial value for good will as the ground for special assessment.

Plaintiff further predicates its right to judgment upon the ground that it acquired a

good will of a cash value of $50,000, and that, although this good will was acquired without cost or without the issuance of stock therefor, it may be included in invested capital as a paid-in surplus.

Conceding, without deciding, that plaintiff has a right to maintain this suit, it is not entitled to recover because under the statute a paid-in surplus may not be allowed in respect of an intangible asset. Daily Pantagraph Co., Inc., v. United States, 37 F.(2d) 783, decided by this court June 10, 1929; Herald-Despatch Co., 4 B. T. A. 1096; Shope Brick Co., 5 B. T. A. 1042; J. M. & M. S. Browning Co., 6 B. T. A. 914; Daily Pantagraph Co., 9 B. T. A. 1173; Stephens-Adamson Mfg. Co., 16 B. T. A. 41. Furthermore, even if a paid-in surplus might be allowed in respect of an intangible asset, there is a complete lack of proof of facts sufficient to establish a cash value for any intangible asset that plaintiff may have acquired upon incorporation. The right given to plaintiff by the Continental Tie & Lumber Company to sell the lumber products of the latter company on a commission basis in a certain territory was perhaps an advantageous arrangement, but this cannot be regarded as the acquisition by the plaintiff of a valuable good will. The acquisition by the plaintiff from the Minnequa Company of certain selling agreements possessed by that company can not enter into invested capital as a paid-in surplus, or otherwise, because nothing was paid for this, and the Minnequa Company was not a stockholder. A. C. F. Gasoline Co., 6 B. T. A. 1337; Frank Holton & Co., 10 B. T. A. 1317.

In addition to the foregoing, plaintiff's claim of value is not justified by the facts. Plaintiff asks the court to adopt the use of Hoskold's formula, and apply it to earnings subsequent to the date on which the value of good will is claimed. The only basis for the application of this formula to subsequent earnings is that upon incorporation Schomburg and Bullen "estimated" that plaintiff would earn a net profit of at least $10,000 a year. This is not sufficient to justify the use of a formula; moreover, there are no facts to establish all of the necessary elements as a basis for the application of the formula. The facts show only the net earnings. There is no proof of the tangible assets employed in the business during the period from 1911 to 1916, inclusive, over which plaintiff seeks to arrive at an annual average to which it applies certain percentages.

The petition must be dismissed, and it is so ordered.

This case was tried before the appointment of WHALEY, Judge. He therefore took no part in its decision.