**NEWS PUB. CO. v. BLAIR, Commissioner of Internal Revenue.**

Court of Appeals of District of Columbia.

Submitted October 3, 1928. Decided December 3, 1928.

No. 4664.

Martin, Chief Justice, dissenting in part.

Harvey D. Jacob, of Washington, D. C., for appellant.

M. W. Willebrandt, Asst. Atty. Gen., and John W. Fisher, C. M. Charest, H. R. Gamble, and Leonard C. Mitchell, all of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB and VAN ORSDEL, Associate Justices.

ROBB, Associate Justice. Petitioner seeks a review of a decision of the United States Board of Tax Appeals (affirming a decision of the Commissioner of Internal Revenue), and has filed a stipulation as required by the Revenue Act of February 26, 1926 (44 Stat. 109, 110 [26 USCA § 1224]).

The Commissioner of Internal Revenue determined against petitioner, News Publishing Company, deficiencies in income and excess-profits taxes for the years 1918 and 1919 in the amounts of $11,114.62 and $8,072.29, respectively. The Commissioner found that the assets of the company consisted of its value in 1904, plus accumulated profits, rejecting petitioner's contention that its invested capital was the actual value of its assets during the taxable years. The Commissioner also rejected petitioner's claim that $78,-139.20 expended in securing new subscribers should be included in invested capital; and likewise rejected petitioner's contention of affiliation with the Washington News Company.

The facts as found by the Board of Tax Appeals are substantially as follows: Petitioner is a West Virginia corporation, having its office at Wheeling, W. Va., and was and is engaged in the publication of a daily afternoon and Sunday morning paper. It was originally organized in 1890 with a capital stock of $14,000. The capitalization was increased from time to time by stock dividends, and one sale of stock to employees for $5,000 cash, making its outstanding capital stock on January 16, 1904, $75,000.

The Intelligencer Publishing Company, a Wheeling, W. Va., corporation, published a daily morning paper in the territory occupied by petitioner. In 1893 the individual or partnership form of organization under which it had operated was abandoned, and the enterprise was incorporated with a capital stock of $100,000.

In 1904 the two publishing companies decided to consolidate their interests; whereupon the Wheeling Printing & Paper Company was incorporated with a capital stock of $400,000. It was agreed that $310,000 of this stock would be issued for the stock of petitioner, and $90,000 for the stock of the Intelligencer; but both petitioner and the Intelligencer retained their corporate existence. The assets of the new holding company consisted of the $75,000 capital stock of petitioner, and $89,000 of the capital stock of the Intelligencer, one stockholder of that company refusing to acquiesce in the consolidation.

In 1914, for reasons of economy in state taxation (and apparently by mutual arrangement), petitioner secured an amendment to its charter, by which its authorized capital stock was increased from $75,000 to $400,000, and new stock was issued to its old stockholders in exchange for stock of the holding company of like par value. The holding company thereupon was dissolved, and its assets, consisting of the stock of the two publishing companies which it held, were taken over by petitioner; petitioner's old stock being canceled.

Petitioner's net worth as shown on its books on January 1, 1904, was approximately $170,000. At the end of 1916 the net worth of petitioner as shown by its books was $341,065.62.

In computing the invested capital of petitioner for 1918 and 1919, the Commissioner allowed as invested capital the capital stock and surplus as reflected by its books at the time of the reorganization in 1904 plus such earnings as had accrued since that date, disallowing the difference between the par value of the holding company's stock which was issued for petitioner's stock in 1904 and the net book value of petitioner's assets at that date.

In 1913 or 1914, citizens at Washington, Pa., not far distant from Wheeling, interested petitioner in organizing the Washington News Company for the purpose of publishing a paper that would reflect their political views. The corporation was capitalized at $25,000; Washington citizens agreeing to contribute $15,000, and petition-

er $10,000. Petitioner contributed the amount pledged by it and received stock therefor. Citizens contributed $11,000 instead of $15,000. Only one of the citizens who contributed was produced as a witness, and he testified that he contributed $1,000, for which stock was issued to him. The presumptions are, as found by the Board, that capital stock was issued for "the entire $11,000." The new company began the publication of the News at Washington, Pa., on April 1, 1914, and continued until 1920, when operations were suspended and the affairs of the corporation wound up. The Board found that "the entire management of the corporation was carried on by the petitioner, and no further contributions were made, or assistance given, by the citizens for the operation or management of the News." It was a losing venture, and petitioner in 1917 determined that its original investment in the News and advances subsequently made, which had been carried as assets, were of doubtful value, since the liabilities of the News exceeded its assets. Thereupon petitioner charged off during 1918 $8,685.61 and during 1919 $16,120.72. Both amounts were disallowed by the Commissioner as deductions from gross income for 1918 and 1919, though they were allowed upon final liquidation of the News.

■ The fundamental contention of petitioner is that the measure of its invested capital should be the actual cash value in 1914 of the two newspaper enterprises. The Revenue Act of 1918 (40 Stat. 1057) placed a special burden upon the income of trades and businesses exceeding what was normally a reasonable return on the capital actually embarked. Section 326(a) of that act (40 Stat. 1092) provides that invested capital for any year, except as provided in subdivisions (b) and (c) thereof, means: "(1) Actual cash bona fide paid in for stock or shares; (2) actual cash value of tangible property, other than cash, bona fide paid in for stock or shares, at the time of such payment; * * * (3) paid-in or earned surplus and undivided profits; not including surplus and undivided profits earned during the year."

The Supreme Court of the United States, in La Belle Iron Works v. United States, 256 U. S. 377, 41 S. Ct. 528, 65 L. Ed. 998, interpreted substantially similar provisions of the Revenue Act of October 3, 1917 (40 Stat. 300), and held that the act, in providing for a deduction of a percentage of "invested capital" and before the computation of the "excess profits" tax upon the income of a domestic corporation, does not mean to include in its definition of invested capital any marking up of the valuation of assets upon the corporate books to correspond with an increase of market value, or any paper transaction by which new shares are issued in exchange for old ones in the same corporation, but which is not in substance and effect a new acquisition of capital property by it. Said the court: "A scrutiny of the particular provisions of section 207 shows that it was the dominant purpose of Congress to place the peculiar burden of this tax upon the income of trades and businesses exceeding what was deemed a normally reasonable return upon the capital actually embarked. But if such capital were to be computed according to appreciated market values based upon the estimates of interested parties (on whose returns perforce the Government must in great part rely), exaggerations would be at a premium, corrections difficult, and the tax easily evaded. Section 207 shows that Congress was fully alive to this and designedly adopted a term—'invested capital'— and a definition of it, that would measurably guard against inflated valuations." Later in the opinion the court held that it was the intent of Congress that invested capital should be determined "according to what actually was embarked at the outset or added thereafter, disregarding any appreciation in values." We are of the view that in finding invested capital for the taxable years the Commissioner properly interpreted the provisions of section 326(a) of the Revenue Act of 1918.

Petitioner's contention is based upon the theory that the amendment to its charter in 1914 "was in effect the creation of an entirely new entity whereby entirely new stock was issued for entirely new assets." The Commissioner and Board properly rejected this contention. The Secretary-Treasurer and General Manager of the petitioner clearly disclosed the reason for the amended charter when he testified: "We had been paying considerable taxes for the Wheeling Printing & Paper Company. We didn't see any advantage in continuing the Wheeling Printing & Paper Company, so we took the necessary steps, by publication, and application to the Secretary of State of West Virginia to have the authorized capital of the News Publishing Company increased to $400,000."

■ The mere amendment of a charter or articles of incorporation does not create a new corporation or otherwise affect the identity of the corporation or its existing rights of action, property rights, or liabilities. 14 C. J. 197. Where one corporation loses its

identity and is merged in another, the latter preserving its identity, and issuing new stock in favor of the stockholders of the former, it is not the creation of a new corporation but an enlargement of the old one. Tomlinson v. Branch, 15 Wall. 460, 21 L. Ed. 189; Yazoo & Mississippi V. R. Co. v. Adams, 180 U. S. 1, 19, 21 S. Ct. 240, 45 L. Ed. 395. It is true that in the latter case it was held that the consolidation there involved resulted in the creation of a new corporation, but it was because of the special circumstances of the case. All the former officers and directors of both companies were supplanted by new officers and directors, and the consolidated railroad was to be operated by men holding their commissions from the new company. "In short," said the court, "nothing was left of the constituent companies but the memory of their existence—the mere shadow of a name." In the present case the record discloses no change of officers—nothing but the issuance of new stock in place of the old. The case is clearly ruled, therefore, by the decision in Tomlinson v. Branch.

The petitioner, when the recapitalization in 1914 was effected, acquired no assets it did not already possess, save only the stock of the Intelligencer, which the Commissioner has valued at par and which under the evidence we find to have been a fair valuation. ██ The record shows that between 1899 and 1916 $76,139.20 was expended in securing new subscribers; in other words, in building up the business. It is contended that this amount should now be treated as accumulated earnings and included in invested capital, on the theory that this expenditure resulted in the acquisition of a permanent asset. On this point the Board said: "That circulation structure is perhaps the most important asset of a news publishing business was recognized by the Board in the Appeal of Gardner Printing Co., 4 B. T. A. 37, and therefore, if its cost can be determined, it must be considered in determining petitioner's invested capital. Our difficulty lies in determining its cost. The only definite statement we have is that there was expended from 1899 to 1916, $76,139.20 as salaries and expenses of solicitors engaged in building up and maintaining circulation structure. We are of the opinion that this is not sufficient." But the Board found that the net worth of petitioner, as shown by its books, increased from $170,000 in 1904 to $341,065.62 in 1916. It is apparent from other findings of the Board that the business of petitioner constantly increased during the period involved. We think the logical inference deducible from these findings is that the amount expended in building up circulation structure directly contributed to this result, and that therefore it should have been allowed as an asset.

██ This brings us to the question whether petitioner and the Washington News Company were affiliated for the years on review under the provisions of section 240 of the Revenue Act of 1918 (40 Stat. 1057, 1081), which provides: "(a) That corporations which are affiliated within the meaning of this section shall, * * * make a consolidated return of net income and invested capital for the purposes of this title and Title III, and the taxes thereunder shall be computed and determined upon the basis of such return: * * * (b) For the purpose of this section two or more domestic corporations shall be deemed to be affiliated (1) if one corporation owns directly or controls through closely affiliated interests or by a nominee or nominees substantially all the stock of the other or others, or (2) if substantially all the stock of two or more corporations is owned or controlled by the same interests." We are of the view that it was correctly held below that the two corporations were not affiliated within the meaning of this statute. The Washington News Company was regularly incorporated and presumably functioned as a corporation. The majority of its stock was outstanding, and neither owned nor controlled by petitioner. Neither does it appear that the officers of the two corporations were the same. In short, for aught that appears, the Washington News Company might at any time have asserted its right to independent control. The statute contemplates something more than control by mere sufferance. The control must have a tangible and substantial basis.

As modified, the decision is affirmed.

Affirmed, as modified.

The CHIEF JUSTICE is of the opinion that the decision of the Board should be affirmed without modification.