## STRONG PUB. CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 4549.

Circuit Court of Appeals, Seventh Circuit.

March 9, 1932.

Rehearing Denied April 4, 1932.

Arnold L. Guesmer, of Minneapolis, Minn. (William B. Hale, of Chicago, Ill., of counsel), for petitioner.

G. A. Youngquist, Asst. Atty. Gen., and Sewall Key and Hayner N. Larson, Sp. Assts. to Atty. Gen. (C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and F. R. Shearer, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., of counsel), for respondent.

Before EVANS and SPARKS, Circuit Judges, and BALTZELL, District Judge.

EVANS, Circuit Judge.

We are, in the instant case, called upon to review the action of the Board of Tax Appeals which assessed deficiency taxes against petitioner in the following amounts: 1919, $133,447.48; 1920, $41,664.97; 1921, $35,204.68. Differences exist between the parties over the amount of petitioner's "invested capital" for these three years. Respondent refused to include three items (the value of the Associated Press membership, the circulation of petitioner's newspaper, and its good will) as part of the taxpayer's "invested capital." Failure to persuade the Board of Tax Appeals of the correctness of its contention in this respect accounts for the assessment of the deficiency taxes and petitioner's appeal to this court for redress.

*The Facts.*—The Chicago Daily News Company was incorporated in 1893 to succeed another company by the same name. It was engaged in the publishing of a daily newspaper in Chicago. Victor Lawson was its sole stockholder. In 1926, it secured an amendment to its charter with a resultant change in its name to Strong Publishing Company.

When incorporated in 1893, the capital stock was fixed at 1,500 shares with $100 par value. In 1917, the stock was increased to 18,000 shares, the additional stock going to Lawson in exchange for real estate and a note. The assets acquired in 1893 by the Chicago Daily News Company consisted of buildings and leaseholds, machinery and equipment, cash, accounts receivable, inventories, and de-

ferred charges aggregating $1,081,304.88. Its outstanding liabilities were $666,792.88. It had a net book value of $414,512 or a surplus over par value of its capital stock of $264,512. The Commissioner included this latter amount in petitioner's "invested capital." Its listed assets did not mention good will, Associated Press membership, or circulation. Upon petitioner's incorporation, however, these items were all transferred to it.

Petitioner's complaint is grounded upon the refusal of the respondent to include as "invested capital" the three items above mentioned, which concededly have a substantial value.

Authority for including or excluding an asset as a part of the "invested capital" must be found in the statutes. Likewise, we must look to the same source to ascertain the meaning of intangible assets. The applicable statutes are quoted below.[1]

The controverted questions may be stated thus: (1) Is circulation of a newspaper intangible property within the definition of the statute? (2) Is intangible property to be included in "invested capital" by virtue of section 326 (a) (3)?

Petitioner contends that circulation is tangible property, but admits that good will and Associated Press membership are intangible property. It contends, however, that, even though intangible property, all three items should be included as a part of its "invested capital" because they come within the provision of section 326 (a) (3). Respondent denies that circulation is tangible property, and denies that any intangible property should be included in "invested capital" under said subsection (3).

*Circulation—Whether Tangible or Intangible.*—The circulation of the paper was 192,-495 in 1893, and petitioner claims that it was reasonably worth at least $1,759,000. It contends that circulation is an item distinct from good will (defined by the statute to be an intangible) and one which is salable per se (citing the instance of a sale of a single edition of a newspaper). In enumerating the characteristics of circulation, the petitioner states that it is a more permanent and substantial asset than physical property.

From these facts petitioner argues that, inasmuch as circulation is not like any of the items specifically denominated by the statute to be intangible, and since it also is not covered by the catch-all phrase "other like property," it must ex necessitate be included in the statutory definition of tangible property, which provides that tangible property shall include (after enumerating specific items) "other property other than intangible property."

Is circulation so akin to "patents, copyrights, secret processes and formulæ, good will, trade-marks, trade-brands, franchises," as to fall within the residuary phrase "other like property"?

It may be conceded for the purpose of the argument that circulation is an item distinct from good will; yet it does not follow that they are not inherently alike in their essential aspects. Circulation grows as the good will of the paper increases. It is, generally speaking, a manifestation of the existence of good will. Without good will there would hardly

[1] Section 325(a) of the Revenue Act of 1918 (40 Stat. 1057) provides:

"That as used in this title—The term 'intangible property' means patents, copyrights, secret processes and formulæ, good will, trade-marks, trade-brands, franchises, and other like property;

"The term 'tangible property' means stocks, bonds, notes, and other evidences of indebtedness, bills and accounts receivable, leaseholds, and other property other than intangible property; * * *"

Section 326(a) provides:

"That as used in this title the term 'invested capital' for any year means (except as provided in subdivisions (b) and (c) of this section):

"(1) Actual cash bona fide paid in for stock or shares;

"(2) Actual cash value of tangible property, other than cash, bona fide paid in for stock or shares, at the time of such payment, but in no case to exceed the par value of the original stock or shares specifically issued therefor, unless the actual cash value of such tangible property at the time paid in is shown to the satisfaction of the Commissioner to have been clearly and substantially in excess of such par value, in which case such excess shall be treated as paid-in surplus: Provided, That the Commissioner shall keep a record of all cases in which tangible property is included in invested capital at a value in excess of the stock or shares issued therefor * * *;

"(3) Paid-in or earned surplus and undivided profits; not including surplus and undivided profits earned during the year;

"(4) Intangible property bona fide paid in for stock or shares prior to March 3, 1917, in an amount not exceeding (a) the actual cash value of such property at the time paid in, (b) the par value of the stock or shares issued therefor, or (c) in the aggregate 25 per centum of the par value of the total stock or shares of the corporation outstanding on March 3, 1917, whichever is lowest;

"(5) Intangible property bona fide paid in for stock or shares on or after March 3, 1917, in an amount not exceeding (a) the actual cash value of such property at the time paid in, (b) the par value of the stock or shares issued therefor, or (c) in the aggregate 25 per centum of· the par value of the total stock or shares of the corporation outstanding at the beginning of the taxable year, whichever is lowest: Provided, That in no case shall the total amount included under paragraphs (4) and (5) exceed in the aggregate 25 per centum of the par value of the total stock or shares of the corporation outstanding at the beginning of the taxable year; * * *"

be a well-sustained circulation. The value and extent of both circulation and good will are dependent upon the same factors—service and the policy of the paper. If the service or policy of the paper varies, the circulation and good will vary accordingly. All the property characteristics ascribed to circulation are certainly as indiscriminately identifiable with intangible as with tangible property. They may be said to be in inseparable alliance with both.

In the only reported decision, Daily Pantagraph v. United States (Ct. Cl.) 37 F.(2d) 783, outside of the Board of Tax Appeals holdings, circulation was held to be intangible property.

■ True, there may be circulation without good will. In fact, instances may be cited where circulation is large whereas the attitude of the public towards the publication is ill. But good will, as used in the statute and as a legal term, is more comprehensive than when used colloquially. It has been defined in Brown v. Benzinger, 118 Md. 29, 84 A. 79, Ann. Cas. 1914B, 582, as: " 'Good will' is 'the advantage or benefit which is acquired by an establishment beyond the mere value of the capital stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers on account of its local position, or from celebrity or reputation for skill, or affluence or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities or prejudices.' "

It was of this sort of good will of which Congress spoke when it defined it to be intangible property.

Nor have we overlooked the fact that circulation as such, alone and separated from the rest of the business of publishing a newspaper, may be sold, and possesses, in some instances, substantial value. But this fact alone is not significant. For, although salability and assignability as such may evidence property existence, they bear only inconsequentially on the distinctions between tangible and intangible property.

The true test by which the two kinds of property may be distinguished is traceable to, and must be found in, their evaluation differences. Congress was not interested in the characteristics of these two classes of property save as such characteristics related to their property values; for Congress was dealing with invested capital (because rate of return on invested capital affected rate on taxable income), and it made its classification of prop-

erty into tangible and intangible property and defined both, and limited the amount of intangible property which could be included in invested capital, because of its interest in the base upon which the taxpayer's income taxes were computed.

Examining the species of property enumerated under the two heads, the chief difference between them, which bears on value, is to be found in the certainty and definiteness with which their value may be ascertained. While no doubt the value of each species of property specifically included within the definition of intangible property may be estimated and appraised, there is nevertheless uncertainty about its value, an indefiniteness, a speculative quality, which is absent from the value of the property specified and defined as tangible.

Final determination of this close question must turn upon the effect of the words "and other like property" as used in the first clause of section 325 (a). This expression must be given some range of equivalents. Such equivalency extends to species of property somewhat like the different kinds enumerated— "patents, copyrights, secret processes and formulæ, good will, trade-marks, trade-brands, franchises, * * *" All of these species of property are in law and in commerce recognized as possessing attributes somewhat different from "stocks, bonds, notes and other evidences of indebtedness, bills and accounts receivable, leaseholds, * * *" And that which earmarks their difference, specifically and as a group, is the presence or absence of speculativeness in determining their value.

■ Considering all the circumstances—the language of the statute, the purpose of the classification of property into tangible and intangible, the differences in the certainty with which their value may be ascertained— we conclude that the circulation of a newspaper falls within the comprehension of the clause "other like property" used in the first paragraph of section 325 (a).

■ *Paid-in Surplus.*—Does subdivision (3) of section 326 (a) include intangible as well as tangible property? The Regulations exclude intangible property from this subdivision. But the Regulations cannot govern if contrary to the provisions of the statute. The courts passing on the question have held that intangible property could not be included as paid-in surplus under this subdivision (3). Landesman-Hirschheimer Co. v. Commissioner, 44 F.(2d) 521 (C. C. A. 6); Lafayette-South Side Bank v. Commissioner, 59 App.

D. C. 91, 33 F.(2d) 646; Baker & Taylor Co. v. United States (D. C.) 21 F.(2d) 787, 789; Lewis A. Crossett Co. v. United States, 50 F.(2d) 292 (Ct. Cl.); Colorado Continental Lumber Co. v. United States, 42 F.(2d) 327 (Ct. Cl.); Daily Pantagraph v. United States, 37 F.(2d) 783 (Ct. Cl.).

In view of these decisions, it would be futile to discuss at great length the underlying question here involved, which is primarily one of statutory construction. Our conclusion is that the first three subsections of section 326 (a) deal with tangible property only, and subsections (4) and (5) deal specifically with intangible property and offer an explanation of congressional action in classifying the taxpayer's invested capital into tangible and intangible property. The maxim, generalia specialibus non derogant, applies.

We are unable, however, to agree with the Board of Tax Appeals in its conclusion that petitioner was not entitled to include any part of its intangible property as invested capital. Subsection (4) authorizes the inclusion of intangible property up to one-fourth of the par value of the total stock of the corporation outstanding on March 3, 1917, if such amount be lower than the value of the intangibles paid in and of the stock issued therefor. As the capital stock, in the instant case, outstanding at such date, was of the par value of $150,000, petitioner was entitled, upon its showing sufficient value in the way of intangible assets, to have $37,500 included in its invested capital for this item.

Other questions presented by petitioner's brief, we have duly considered and deem discussion of them unnecessary.

The order of the Board of Tax Appeals is reversed, with directions to increase petitioner's invested capital by the sum of $37,500 for each of the years in question and to recompute its tax accordingly.