**MEREDITH PUB. CO. v. COMMISSIONER OF INTERNAL REVENUE.**

No. 9485.

Circuit Court of Appeals, Eighth Circuit.
April 17, 1933.

Rehearing Denied May 24, 1933.

D. M. Kelleher, of Washington, D. C. (F. W. McReynolds, of Washington, D. C., on the brief), for petitioner.

Hayner N. Larson, Sp. Asst. Atty. Gen. (G. A. Youngquist, Asst. Atty. Gen., Sewall Key, Sp. Asst. Atty. Gen., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Arthur Clark, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., on the brief), for respondent.

Before STONE, VAN VALKEN-BURGH, and BOOTH, Circuit Judges.

VAN VALKENBURGH, Circuit Judge.

This is an appeal from an order of redetermination of the Board of Tax Appeals affirming a determination of the Commissioner of Internal Revenue and adjudging against petitioner deficiencies in income taxes for 1922 and 1923 in the respective amounts of $12,694.43 and $9,213.31.

The petitioner is a corporation engaged in the publication of magazines, to wit, "Successful Farming," "Fruit, Garden and Home" —later named "Better Homes and Gardens," and "The Dairy Farmer." In 1922 it purchased the periodical called "The Dairy Farmer," and established another then known as "Fruit, Garden and Home." The Dairy Farmer had at that time a subscription list or circulation structure of approximately 58,000. As stated by the Board of Tax Appeals, and in this both parties agree, a campaign was forthwith started to build up circulation for "The Dairy Farmer" and to establish a circulation for "Fruit, Garden and Home." In 1922 petitioner expended $15,-060.10, and in 1923, $49,729.13, in securing subscriptions for "The Dairy Farmer." Of the latter amount $5,338.77 represented expenses incurred in securing renewal subscriptions. In 1922 it expended $92,828.74 in building up the circulation of "Fruit, Garden and Home," of which amount $72.75 was for renewals. In 1923, for the latter magazine, it spent $104,454.28 in securing new subscriptions, and $13,899.91 for renewal subscriptions. In general the Commissioner allowed deductions for all expenditures incurred in securing renewal subscriptions, and disallowed those in acquiring new subscriptions. He allowed the amount of $15,060.10 expended in 1922 upon the circulation of "The Dairy Farmer," because the circulation structure of that magazine was not increased during that year. For 1923 he allowed $47,339.19 of the amount expended in securing new subscriptions to "Fruit, Garden and Home," "as the proper portion applicable to maintenance of the established circulation structure." He disallowed $92,755.99 expended in building up the circulation of "Fruit, Garden and Home" in 1922, "since it represents an expenditure to acquire new subscriptions, that magazine having no circulation at the beginning of the period."

As has been said, these rulings of the Commissioner were sustained by the Board of Tax Appeals. The questions presented are thus succinctly stated by counsel for the government:

"1. Whether the cost of increasing circulation of a magazine is a capital expenditure or merely an expense in the nature of upkeep and therefore deductible from gross income under Section 234 (a) (1) of the Revenue Act of 1921.

"2. If circulation is a capital asset, whether it is subject to periodic exhaustion with the expiration of subscriptions so as to entitle the owner to a deduction therefor from gross income under Section 234 (a) (7) of the Revenue Act of 1921."

The contention of the petitioner is thus stated in argument and brief: "The expenses of a publisher in building up a clientele for a magazine are in the same category essentially as expenses of a mercantile or other enterprise to attract new customers. The good will so acquired is in neither case a capital asset."

That the circulation of a magazine or newspaper is an intangible capital asset does not admit of doubt. The Commissioner of Internal Revenue has consistently so held from his first consideration of the question, and his holding has been upheld and approved by the courts. Danville Press, Inc., 1 B. T. A. 1171; Gardner Printing Co., 4 B. T. A. 37; Herald-Despatch Co., 4 B. T. A. 1096; Walter S. Dickey, 14 B. T. A. 1295; Tulsa Tribune Co., 21 B. T. A. 1405; Public Opinion Publishing Co., 6 B. T. A. 1255; Commercial Nat'l Ins. Co., 12 B. T. A. 655, 657; News Publishing Co. v. Blair, 58 App. D. C. 295, 29 F.(2d) 955; Strong Publishing Co. v. Commissioner (C. C. A. 7) 56 F.(2d) 550.

And it must follow that money expended in building up this circulation structure is a capital expenditure, and not the ordinary and necessary expense incurred in carrying on a trade or business, under the provisions of

892

section 234(a) (1) of the Revenue Act of 1921 (42 Stat. 254). Such expenditure under said section 234 to be deductible must be in the nature of upkeep—not of investment [Duffy v. Central R. R. Co. of New Jersey, 268 U. S. 55, 63, 45 S. Ct. 429, 69 L. Ed. 846]; and must be both ordinary and necessary in the conduct of a business or trade [Robinson v. Commissioner (C. C. A. 8) 53 F.(2d) 810, 79 A. L. R. 975; Lloyd v. Commissioner (C. C A. 7) 55 F.(2d) 842, 843].

In Herald-Despatch Company, 4 B. T. A. 1096, the Board of Tax Appeals well said: "Circulation, in reality, is the very foundation upon which a newspaper publishing business is built. It is always a matter of first importance in the purchase and sale of a newspaper publication."

And, again, in Gardner Printing Company, 4 B. T. A. 37, 39, 40: "Perhaps the most important asset of a news publishing business is its reading and advertising clientele. The advertising clientele is built up on the basis of an approved subscription list, and, therefore, in the parlance of the publishers' business, this asset is known as the circulation structure. When a publishing business is started a considerable portion of its capital goes into the development and upbuilding of this circulation structure, in much the same manner that a manufacturing business puts its capital into factory buildings and machinery which constitute its plant. So the circulation structure of a news publishing plant represents a considerable portion of the capital investment. This circulation structure is evidenced by subscription lists and book accounts which, in a well regulated publishing business, are periodically verified and audited in a manner not unlike the periodical inventorying of plant and equipment of other businesses. And to the same extent that an inventory of buildings and machinery represents capital for a manufacturing business, so a verified and audited circulation structure must represent capital of a publishing business."

It was stated in argument before us that a magazine, having a subscription list, or circulation, of from 100,000 to 200,000 subscribers, has a sale value of at least $1,000,000, while its tangible assets in the way of building, printing presses, etc., may be worth less than $50,000 or $100,000. Its sale value is governed largely by the amount it can earn through its advertising, the rates for which are based upon circulation. Examination of the circulation and advertising data disclosed by the exhibits contained in the record confirms this statement. In 1922, "Successful Farming," an established publication, had an income from advertising of $1,225,406.50. With "The Dairy Farmer," and "Better Homes and Gardens," the increased revenue from advertising for years kept pace with the increases in circulation. In these, as in publications generally, the circulation structure, once substantially established, becomes comparatively stable, and does not fluctuate in strict ratio to the number of subscriptions. This, however, is convincing proof that such a structure is a positive capital asset, irrespective of incidental fluctuations in circulation, due to temporary influences, such as economic depression, causing withdrawals, and failure of renewals. In general, it may be said that the circulation of a magazine which carries advertisements is the main basis of its commercial value. This is practically conceded by representatives of petitioner. The witness Corbin, director of sales and promotion for the Meredith Publishing Company, said: "Obviously for advertising purposes the circulation structure has value. People are going to pay more for advertising in a magazine having a large circulation than a small circulation; our rate is in proportion to the value of our circulation and the quality of it."

Honnicutt, circulation director of petitioner, testified thus: "There is an increase in advertising rate. You get more advertising when you get more circulation. That is the measure by which it is gauged, an intangible measure."

It is urged by petitioner that the system of income tax laws does not contemplate capitalization of intangibles, such as good will; that a magazine circulation partakes of the nature of good will, and that the expenses of a publisher in building up the circulation of a magazine "are in the same category essentially as expenses of a mercantile or other enterprise to attract new customers"; that the good will so acquired is in neither case a capital asset. None of these positions are so far tenable in law as to condition the disposition of this case. As has been pointed out, the circulation of a newspaper or magazine is an intangible capital asset. The circulation structure is the most important capital asset of a news publishing or magazine business. Appeal of Gardner Printing Co., 4 B. T. A. 37; News Publishing Co. v. Blair, 58 App. D. C. 295, 29 F.(2d) 955, 958. It is true that circulation has some of the qualities of good will. It is rather a manifestation of the existence of good will, but is an item distinct from it. Strong Publishing Co. v. Com-

missioner, supra, loc. cit. 551 of 56 F.(2d). However, it is well settled that payments made for the purchase of good will, as an incident to the passing of property, may constitute part of invested capital. Three-in-one Oil Co. v. United States (Ct. Cl.) 35 F. (2d) 987. There is nothing in Red Wing Malting Co. v. Willcuts (C. C. A. 8) 15 F. (2d) 626, 49 A. L. R. 459, in conflict with this view. But in the case before us the subscriptions were procured as a part of the circulation structure, the main item of invested capital, with its incident, merely, as a manifestation of good will.

There is an essential difference between the expenses of a publisher in building up a circulation and the advertisements of a mercantile or business enterprise, designed to attract new customers. Advertising, in ordinary business, does not generally, if at all, increase the price of the commodity advertised and sold, while, in the case of a magazine, the increased circulation does directly affect the rate charged for advertising in the periodical —the main commodity which the magazine has for sale. In this way the money expended to increase circulation augments the capital structure of the publication, and becomes a capital expenditure.

It is also suggested that this circulation structure, being somewhat of the nature of good will, and an intangible, is not 'subject to the wear and tear of tangible property which forms the basis of depreciation, and is, therefore, improperly classed as a capital asset. A sufficient answer to this suggestion is that circulation is an item distinct from good will, and that susceptibility to depreciation is not an essential element of a capital asset.

Petitioner's final and alternative contention is that the cost of new subscriptions should be amortized over the lives of the subscription contracts, some of which are for longer periods than one year. In our judgment this contention is based upon a misconception of the inherent nature of the circulation structure. That structure, once established, is not a mere aggregation of disconnected individual subscriptions, but rather a combination of such units with a measurable degree of permanency. In the Herald-Despatch Case, 4 B. T. A. loc. cit. 1105, 1106, the Board of Tax Appeals said: "The term circulation, as used in newspaper publishing businesses, comprehends something much broader than what may be characterized as mere subscription lists. * * * It comprehends, on the one hand, a body of subscribers whom experience has demonstrated may be relied upon with some degree of certainty to continue to take and renew their subscriptions to the paper in the future. On the other hand, it includes within its scope an established advertising clientele who use the paper as a medium by which to reach the purchasing public."

With this statement we agree. However, we feel that this contention of petitioner, if in any degree meritorious, is substantially satisfied by the practice of allowing deductions for the expense of securing the number of subscriptions required to replace expirations and cancellations during the year. In the case at bar the Board stated the practice thus: "Circulation structure is an asset which must be continually supported by bringing in new subscriptions to replace those which are continually expiring. Gardner Printing Company Case, supra. The cost of so supporting the circulation structure is an ordinary and necessary business expense but the cost of building up or establishing a circulation structure must be charged to capital."

In this manner the integrity of the circulation structure in each year is maintained. The deductions permitted partake of the nature of allowances for depreciation or amortization, for which petitioner contends, and take care of the matter in a practical way and with least complexity and confusion. The decision of the Board of Tax Appeals is affirmed, and the petition for review is dismissed.

BOOTH, Circuit Judge (concurring). With much doubt I concur in the result.