## HOUSTON NATURAL GAS CORPORATION v. COMMISSIONER OF INTERNAL REVENUE.

### No. 4153.

Circuit Court of Appeals, Fourth Circuit.
June 14, 1937.

Irl F. Kennerly, of Houston, Tex. (Williams, Lee, Sears & Kennerly, of Houston, Tex., on the brief), for petitioner.

Ellis N. Slack, Sp. Asst. to Atty. Gen. (James W. Morris, Asst. Atty. Gen., and Sewall Key, Sp. Asst. to Atty. Gen., on the brief), for respondent.

Before NORTHCOTT and SOPER, Circuit Judges, and Harry E. Watkins, District Judge.

HARRY E. WATKINS, District Judge.

This is a petition to review a decision of the United States Board of Tax Appeals. The Commissioner of Internal Revenue determined against the Houston Natural Gas Corporation an income tax deficiency for the year 1930 of $21,646.67. The single question involved is whether certain expenditures by the Gas Corporation during the year 1930 for paying solicitors, and installing free service lines to customers, were made in the acquisition of a capital asset, and not deductible in computing income tax, as contended by the Commissioner, or were expenses of carrying on business, and deductible from gross income, within the meaning of section 23(a) of the Revenue Act of 1928 (26 U.S.C.A. § 23(a) and note), as claimed by the gas corporation.

Prior to 1927, the Houston Gas & Fuel Company (hereinafter referred to as the fuel company) had a complete monopoly of the gas business in Houston, Tex., a city having a population of 139,000 in 1920, and 292,000 in 1930. In July, 1927, the city of Houston granted a franchise to Houston Natural Gas Corporation (hereinafter called the gas corporation) to distribute natural gas within its borders. Because of opposition of the fuel company, the Houston city officials declined to issue permits to the gas corporation under its franchise for the construction of gas mains, with the result that the gas corporation was unable to serve consumers in Houston who had signed applications for gas service. The controversy between the two companies became so acute that it was the primary issue in a city election held in December, 1928. A new mayor was elected for the city, and within a short time the gas corporation obtained construction permits and thereafter began to parallel the lines of the fuel company. Both companies charged the same rates for domestic gas. On November 30, 1928, the gas corporation sold all of its properties in practically all areas except Houston, suburban Houston and Pasadena, Tex. At the time of the sale it was serving a total of 8,064 customers, of whom 1,458 were within the city of Houston, and the remaining were outside the city. Most intense competition followed. By the close of 1929, the gas corporation was serving a total of 10,490 domestic and industrial consumers, of whom 8,729 were within the city of Houston, and the remaining 1,761 were outside the city. By the close of 1930 its total consumers had increased to 15,960, of whom 13,903 were within the city of Houston, and the remaining were outside the city.

Methods pursued by both companies to secure new customers and hold the old ones included the employment of a large force of solicitors, whose duties and activities were stipulated by counsel to be as follows: "to keep informed concerning prospective new customers, to try and sell gas service to the same, cultivate and maintain the good will of old customers as well as prospective new customers, prevent their company's consumers from switching to the competing company, persuade the competing company's consumers to become consumers of their company, combat similar activities of the competing company's solicitors, and otherwise to support and increase the volume and profitableness of their company's business." During 1929, the gas corporation expended a total of $42,353.16, and during 1930, a total of $69,156.15, in payment of salaries and expenses of the solicitors so employed by it. One of the methods pursued by each company was to give away and to install service lines free of cost to consumers. A service line is a small gas transmission line, embedded in the ground from 12 to 18 inches, connecting with the gas company's distribution system

at the consumer's property line and extending across his property to his meter location. In that part of Houston where the company lines did not parallel, neither of the competing companies installed free service lines to consumers. The gas corporation expended during the year 1929 a total of $97,580.17, and in 1930 a total of $111,232.75 in giving away and installing such free service lines. The respective amounts expended for the hire of solicitors were not segregated on its bo)ks between the acquisition of new customers and the retention of old, but such amounts, together with the amounts expended for free service lines, were charged on the books to an account termed "Property Account." The gas corporation deducted depreciation thereon in subsequent years on its books, but it has never made a claim for exhaustion of the item in its income tax.

These expenditures were claimed as ordinary and necessary business expenses in the returns filed for the respective years, and were allowed as deductions in 1929, but the amounts expended in 1930 were disallowed as deductions by the Commissioner, and his action was affirmed by the Board of Tax Appeals. From that action, this appeal was taken.

We are of the opinion these expenditures were correctly disallowed. Under the evidence, they must be considered not upkeep, but investment; not maintenance or operating expense, deductible under the law, but capital, subject to any proper annual allowance for exhaustion. In Gauley Mountain Coal Co. v. Commissioner of Internal Revenue (C.C.A.4th) 23 F.(2d) 574, 576, Judge Parker of this court said: "* * * we think it is clear that, to constitute invested capital, there must have been (1) a laying out of money or money's worth, and (2) the acquirement of something of permanent use or value in the business." See Duffy v. Central R. Co., 268 U.S. 55, 63, 45 S.Ct. 429, 430, 431, 69 L.Ed. 846. Applying the rule as thus stated, to the facts of the case before us, it is clear that there was both an expenditure of a large amount of money, and the acquirement of something of permanent use or value in the business. The taxpayer here admits the expenditure of money, but denies the acquisition of anything of permanent use or value in its business. The answer to that contention is that in 1930 the gas corporation acquired (1) 5,470 new customers, and (2) good will,'and (3) elimination of competition.

Money expended for new customers or subscribers, and for good will, is a capital investment. Three-In-One Oil Co. v. U. S. (Ct.Cl.) 35 F.(2d) 987, 989; Meredith Publishing Company v. Commissioner (C.C.A.) 64 F.(2d) 890, 891, certiorari denied 290 U.S. 646, 54 S.Ct. 64, 78 L.Ed. 560; Strong Publishing Co. v. Commissioner (C.C.A.7th) 56 F.(2d) 550; News Publishing Co. v. Blair, Commissioner, 58 App.D.C. 295, 29 F.(2d) 955. That the cost of eliminating competition is a capital asset has been established by a long line of decisions. Newspaper Printing Company v. Commissioner, 56 F.(2d) 125 (C.C.A.3rd); Public Opinion Pub. Co. v. Jensen, 76 F.(2d) 494 (C.C.A.8th). In Commercial National Insurance Co. v. Commissioner, 12 B.T.A. 655, the cost of increasing an insurance policy list was held to be a capital investment. Amounts expended for novelty banks distributed to obtain new depositors, were disallowed as a business expense in Liberty Insurance Bank v. Commissioner, 14 B.T.A. 1428, reversed on other issues Commissioner v. Liberty Bank & Trust Co. (C.C.A.) 59 F.(2d) 320, on the ground that the expenditures created benefits extending into future years. Money expended for salaries of agents, advertising, and samples were held to be a capital investment in Appeal of Northwestern Yeast Co., 5 B.T.A. 232.

Courts must look to the substance rather than the form of a particular transaction in applying taxing statutes. United States v. Phellis, 257 U.S. 156, 42 S.Ct. 63, 66 L.Ed. 180; McCaskill Co. v. United States, 216 U.S. 504, 30 S.Ct. 386, 54 L.Ed. 590. A large list of satisfied customers on the books of this corporation is not merely an aggregation of disconnected individuals, but is a combination of business with a measurable degree of permanency. Its customers, with service lines completely installed, may be depended upon with some degree of certainty to continue to purchase gas from it in the future. In Gauley Mountain Coal Co. v. Commissioner, supra, this court said: "Intangible property, which enables a taxpayer to save or earn money, is as legitimate a form of capital investment as tangible property." Whether it is called good will or something else, is unimportant, so long as it constitutes invested capital.

In the instant case, the gas corporation's campaign to get new business was highly successful and resulted in benefits of lasting or permanent character. As the result of the campaign to get new customers, inau-

gurated in 1929, its customers increased 600 per cent. in 1929, and 60 per cent. in 1930. Subsequently, its rival went into receivership. It is also significant that the gas corporation charged these expenditures to a capital account upon its own books.

An attempt is made by the taxpayer to distinguish the publishing company cases, hereinbefore cited, from the case under consideration upon the ground that advertising is the chief source of a newspaper revenue, and that by building up the circulation structure, the profits from newspaper advertising increase. For income tax purposes, we see no such distinction. If a gas company increases its customers, its proportionate overhead expense will ordinarily decrease and its profits increase, just as they will for a newspaper if its subscribers increase.

The gas corporation also contends that the cases cited above are not controlling for the reason that in 1930 it had passed out of its organization or promotion stage. We think the evidence clearly establishes the contrary. While the company was organized in 1925, it sold practically all its properties outside Houston in 1928, such that in 1929 and 1930 it was entering a comparatively new field in Houston where it had not been able to do much business theretofore. But an intensive campaign to get new customers at any time gives rise to capital expenditures, and the time when such expenditures might be incurred is not confined to the early or formative stages of a company, as the taxpayer here contends. Appeal of Northwestern Yeast Co., supra; Liberty Insurance Bank v. Commissioner, supra.

Undoubtedly a part of the expenditures in question were made to retain old customers, but the record is wholly devoid of any evidence to show what part of the money so expended was to keep old customers and what part was used to get new customers. The burden of showing this is upon the taxpayer. Three-In-One Oil Co. v. United States, supra; Richmond Hosiery Mills v. Commissioner (C.C.A.) 29 F.(2d) 262, 263. The taxpayer, upon appeal, asks, in the alternate, for the first time, to be permitted to depreciate the capital asset acquired as a result of these expenditures. Inasmuch as this issue has not been pleaded and no evidence has been introduced as to the useful life of the asset, that question is not before this court.

Without any evidence before us to show what part of these expenditures are chargeable against current income, the whole amount must be disallowed as an ordinary and necessary business expense. We therefore affirm the decision of the Board of Tax Appeals.

Affirmed.