Briarcliff Candy Corporation (formerly Loft Candy Corporation) v. Commisioner.
Briarcliff Candy Corp. v. Commisioner
Docket No. 5163-68.
United States Tax Court
T.C. Memo 1972-43; 1972 Tax Ct. Memo LEXIS 214; 31 T.C.M. (CCH) 171; February 22, 1972, Filed John J. Yurow and John Harllee, Jr., for the petitioner. *215 Rudolph J. Korbel, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined a deficiency in petitioner's income tax for the taxable year ended June 27, 1959, in the amount of $113,628.03. The issue for decision is whether petitioner, in computing its net operating loss deduction for its fiscal year 1959, is entitled to a carryback from its fiscal year 1962, determined with a deduction in the later year as ordinary and necessary business expenses, of amounts spent in connection with obtaining new outlets for its products; or whether the expenditures were made in acquiring a capital asset. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner, Briarcliff Candy Corporation (formerly Loft Candy Corporation), was incorporated in 1939 under the laws of the State of New York. Its principal office at the time of the filing of the petition in this case was at 38-38 Ninth Street, Long Island City, New York. Petitioner's sole production facility was also at this location. During the period ended May 3, 1971, petitioner and its predecessors (which date back to before the turn of the century) *216 were engaged in the manufacture and/or sale of a wide variety of candy and confectionery products consisting principally of boxed and bulk chocolates, and also including specialty candies, hard candies, chocolate bars and nuts. On May 3, 1971, petitioner sold its trademarks, certain plant equipment and machinery, and other business assets to Barricini Stores, Inc., a subsidiary of The Southland Corporation. On the same date petitioner changed its name to Briarcliff Candy Corporation. Petitioner reports its Federal income tax liability under an accrual method of accounting and files its returns on the basis of a 52-53 week taxable year ending on the Saturday nearest June 30. Petitioner filed its Federal corporation income tax returns for the taxable years ended June 27, 1959 and June 30, 1962, with the district director of internal revenue for the Brooklyn district of New York. During and prior to the taxable year ended June 30, 1962, more than 80 percent of petitioner's sales were retail sales made through retail candy shops operated by petitioner. The balance of the sales were made at wholesale prices to department stores and other independently owned and operated retail outlets.
*217 During this period, while petitioner's sales volume remained constant, its sales per retail outlet declined as a result of a general change in consumer shopping patterns. There was an apparent trend to suburbanization. Petitioner, as did other candy companies, attempted to retain its customers by opening retail outlets in the suburbs. However, the suburban stores could only achieve a fraction of the sales volume of downtown stores resulting in a proportionately higher operating cost and a lower profit margin. Thus, there developed a general trend in the industry to attempt to locate new channels of distribution and new markets in department stores, greeting card stores, and drugstores in order to increase sales volume, reduce operating costs, and reestablish a satisfactory profit margin. The following schedule reflects petitioner's operating profit for the 4 fiscal years preceding its fiscal year 1962: Operating profit
Year
before Federal
Nded
income tax
July 1, 1961
$257,390
July 2, 1960
612,388
June 27, 1959
623,722
June 28, 1958
886,614
In the latter part of 1961, petitioner's management instituted a program of soliciting independently operated *218 retail outlets, 172 primarily in drugstores, card stores and the like to establish departments for the distribution of Loft candies. In pursuance of this program, a separate division, then known as the "franchise" division, was established by petitioner under the direction of a vice president. This division, which was staffed with a sales manager, several salesmen and clerical personnel, was assigned the responsibility of (a) soliciting independent drugstores (and other retail outlets) to establish Loft candy departments in their stores, (b) entering into contracts with those stores which desired to participate, and (c) providing continuing services and a flow of merchandise to contracting stores. The initial step in the foregoing program was an extensive advertising campaign, including the placement of advertising in drugstore trade journals, the preparation of advertising circulars to be mailed to drugstores throughout the country and placing information booths at druggist trade conventions. During the taxable year ended June 30, 1962, petitioner contacted approximately 50,000 independent drugstores through mailings at 6-week intervals. Included in each mailing was a card *219 addressed to petitioner which the drugstore proprietor was requested to fill out and return if he were interested in discussing the franchise program further. Approximately 2,000 response cards were received by petitioner during its fiscal year 1962. The next step in the program was to make telephone contact with drugstore proprietors who had sent in the response cards to arrange an appointment with one of petitioner's salesmen. As a result of such telephone contacts, approximately 600 appointments were arranged and held during the taxable year ended June 30, 1962. These appointments resulted in the signing of 159 contracts during the taxable year ended June 30, 1962. In each contract, the drugstore proprietor ("purchaser") agreed to set aside space in his store to be exclusively devoted to the sale of Loft candies, to equip such space with a refrigerated display and storage counter at his expense, and to use his best efforts to sell Loft candies to his customers. In most cases the refrigerated display and storage counters were sold by petitioner to the purchaser at petitioner's cost of $2,600, but this charge was increased in subsequent years to $3,000 so as to have the drugstore *220 bear at least a part of the cost of locating potential outlets for petitioner's product. Petitioner agreed to sell candy to the purchaser at a discount from the retail value and to render assistance to the purchaser in connection with setting up and operating the Loft's department. Petitioner further agreed not to establish a Loft's candy department in any competing drugstore located within a specified distance from the purchaser. Each contract provided that after the initial term it would continue from year to year unless either party terminated by giving 30 days' notice to the other party. In some cases, petitioner agreed to repurchase the display and storage equipment acquired by the purchaser if the purchaser's sales of candy during the first year of operations did not exceed a specified amount. The following table shows the initial terms of 130 of the 159 contracts signed during the taxable year ended June 30, 1962: Number of
Term
contracts
1 year
21
2 years
44
3 years
58
4 years
5
5 years
2
The following schedule reflects the expenses of operating petitioner's "franchise" division for the taxable year ended June 30, 1962, and the manner in *221 which such expenses were allocated between promotional expenses and recurring operating expenses by the respondent: 173 Recurring
Total
Promotional
operational
expenses
expenses
expenses
Salaries:
Salaries of salesmen, opening personnel, supervisors, etc.
$ 52,558
$ 52,558
S. Kostick
20,000
20,000
J. Joyce
12,500
12,500
Three clerks
9,500
$ 9,500
One secretary - S. Kostick secretary
5,000
5,000
Shipping department
6,000
6,000
Maintenance
4,000
4,000
Hack (1/2)
5,500
5,500
Compensation insurance
4,298
4,298
Supplies
5,206
5,206
Miscellaneous
5,177
5,177
Repairs
454
454
Telephone
3,957
3,000
957
Postage
2,451
1,500
951
Advertising
11,235
11,235
Freight and express
9,715
9,715
Damaged goods
166
166
Traveling
32,116
32,116
Commissions
8,104
8,104
Printing and stationery
5,024
3,000
2,024
Do-A-Friend Bonus
800
800
Empty boxes
1,056
1,056
Travel and entertainment
5,765
3,265
2,500
Bad debts
7,250
7,250
Art work
3,605
3,605
Circulars
978
978
Price tickets
2,447
2,447
Box wrap and designing
582
582
Display
18,917
18,917
Promotional
69,637
69,637
Outside service
2,060
2,060
S. Kostick - travel
10,941
10,941
Consultant fees
2,000
2,000
Insurance
1,000
1,000
Dun & Bradstreet
1,475
1,475
Storage 20,000
20,000
Total expenses
$351,474
$230,633
$120,841
Less expenses charged to retailers (18,605)
(18,605)
NET EXPENSES $332,869
$212,028
$120,841
*222 174 Of the amount ($212,028) determined by respondent to constitute "expenses and costs incurred to secure franchises," $12,500 consisted of the salary paid to the sales manager of the "franchise" division. The following schedule shows the portion of the remainder of such expenses which is estimated to have been attributable to (a) advertising in trade journals and initial mailing to approximately 50,000 prospective drugstore outlets, (b) making telephone contact with the approximately 2,000 prospective drugstore outlets which had returned response cards, (c) holding appointments with approximately 600 store proprietors, and (d) assisting in the opening of Loft candy departments in the 159 stores which entered into contracts with petitioner: Advertising
Loft candy
and initial
Telephone
Personal
department
mailings
contact
contact
openings
Salaries
$ 11,371
$11,371
$28,428
$ 5,686
Supervision
15,471
7,735
7,735
Travel and entertainment
7,076
21,229
7,076
Promotion
52,228
17,409
Advertising
8,426
2,809
Telephone
3,000
Circulars
978
Art work
3,605
Postage
1,500
Printing and stationery
3,000
Consultant fees 2,000
$104,677
$22,106
$57,392
$33,958
Less: Charge to retailers
(18,605) $104,677
$22,106
$57,392
$15,353
*223 In its annual report for its fiscal year ended June 30, 1962, petitioner showed as an asset as of the close of the year the following: "Cost of franchise program deferred (Note B)…$86,877" Note B which was entitled, "Franchised Retailers," stated in part: The Company, during the fifty-two weeks ended June 30, 1962, commenced the sale of its products through franchised retailers. Net costs of $86,877 incurred in this connection, after deducting applicable income taxes amounting to $93,000, have been deferred for financial accounting purposes and will be charged to future operations. During the taxable year ended June 30, 1962, petitioner derived gross receipts in the amount of $400,729 from the sale of candy to drugstore outlets solicited by the "Franchise" division. In the years following the taxable year ended June 30, 1962, petitioner continued to incur substantial costs and expenses of the same general type as those incurred during the taxable year ended June 30, 1962, for the purpose of soliciting new agencies. In the years following the taxable year ended June 30, 1962, petitioner's sales through the drugstore outlets increased steadily in amount. The solicitation *224 of drugstore outlets (which came to be called "agencies") continued throughout the succeeding taxable years with the result that petitioner had 1,640 agencies as of June 28, 1969. During the taxable year ended June 28, 1969, approximately 66 percent of petitioner's sales were made by approximately 250 company-operated retail candy shops, 18 percent were made to the 1,640 agencies, 8 percent were made to 160 department stores and franchised candy shops, and 8 percent were made to other outlets. During the taxable year ended June 28, 1969, almost 86 percent of petitioner's sales through agencies were made in the northeastern States of New York, New Jersey, Pennsylvania, and Connecticut. The following table shows the number of agencies opened, the number of agencies closed, and the number of agencies in operation at the end of each taxable year ended June 30, 1962, through June 27, 1968: 175 Agencies operating
Agencies
Agencies
at close of
Taxable year
opened
closed
taxable year
June 30, 1962
159
159
June 29, 1963
339
8
490
June 27, 1964
392
36
846
June 26, 1965
415
75
1,186
July 2, 1966
268
74
1,380
July 1, 1967
112
132
1,360
June 27, 1968
195
90
1,465
*225 The following table shows the number of the original 159 agencies which were closed in each of the taxable years ended June 29, 1963, through June 27, 1968, and the number of the original 159 agencies which were still in operation at the end of each such taxable year: Original
agencies
Taxable year
Original agen-
operating at
ended
cies closed
end of year
June 29, 1963
6
153
June 27, 1964
9
144
June 26, 1965
10
134
July 2, 1966
3
131
July 1, 1967
8
123
June 27, 1968
2
121
The 15 original agencies which were closed during the taxable years ended June 29, 1963, and June 27, 1964, were closed for the following reasons: Bankruptcy or fire (5); agency exercised option to cancel (4); poor performances by agency (3); petitioner exercised option to cancel (2); and failure of agency to pay bills (1). Petitioner's management, between March 1968 and January 1969, determined that the profits generated by the agencies was not sufficient to justify the administrative problems and the obligations and restrictions (such as the territorial restrictions) imposed upon petitioner by the agency contracts. Accordingly, it was determined to terminate *226 each of the agency contracts at the earliest date on which such termination could be rightfully effected. As a result of this policy, the number of agency contracts in force was reduced from 1,640 on June 28, 1969, to 179 on May 3, 1971. On February 3, 1971, petitioner entered into an agreement, subject to approval of its stockholders, to sell its trademarks and trade names, usable inventories, customer lists, agency contracts, manufacturing formulas, standards, guidelines, and other production know-how, and a portion of its plant equipment and machinery to Barricini Stores, Inc., a subsidiary of The Southland Corporation. The total price payable under the agreement for all intangibles, including the agency contracts, was $10,000. On the same date petitioner entered into a second agreement, also subject to the approval of petitioner's stockholders, under which it agreed to sublease 73 of its retail candy stores, and to lease the leasehold improvements and fixtures contained therein, to The Southland Corporation. The sale was approved at a special meeting of shareholders on April 19, 1971, and was consummated on May 3, 1971 (as of April 30, 1971). Petitioner in computing its net *227 operating loss on its Federal income tax return for its fiscal year 1962, deducted under various designations all the amounts expended or incurred with respect to its "franchise" division. Respondent in his notice of deficiency disallowed $212,028 of these claimed deductions with the following explanation: It is determined that promotional expenses and costs in the amount of $212,028.00 were incurred to secure franchises having an indeterminate life. Since these amounts represent capital expenditures not subject to depreciation or amortization (See Regulations section 1.167(a)- 8 of the Internal Revenue Code), they are disallowed as deductions for the taxable year ended June 30, 1962. Opinion Section 162, I.R.C. 1954, [1] provides for the deduction of all ordinary and necessary expenses incurred in carrying on a trade or business. Section 263 provides that no deduction shall be allowed for amounts paid for permanent improvements or betterments made to *228 increase the value of any property. Such amounts are the cost of capital assets which, if the asset acquired is an exhaustible asset with an ascertainable useful life, may give rise to a depreciation deduction under section 167. Petitioner asserts that amounts expended in the drugstore solicitation program were "ordinary and necessary" business expenses which are fully deductible in the fiscal year 1962. Petitioner views such expenditures as being made to promote the sale of its 176 products in the ordinary course of business and therefore currently deductible. Respondent's position is that the amounts in issue are investment capital expended for the acquisition of franchised sales outlets, and that such amounts are capital expenditures which are not deductible under section 263 but which must be capitalized. Respondent further asserts that the capital assets in the hands of petitioner are of an indefinite life and are therefore not subject to depreciation or amortization under section 167. It is well established *229 that "expenditures made for benefits which are to be enjoyed for a period extending beyond the year in which they are made should be capitalized" and if the assets acquired are of an exhaustive nature having a determinable useful life, depreciated or amortized ratably over the useful life of the asset. Houston Natural Gas Corporation, 34 B.T.A. 228 (1936), aff'd 90 F. 2d 814 (C.A. 4, 1937) certiorari denied 302 U.S. 722 (1937). Such expenditures may not be deducted from income as ordinary and necessary business expenses. It has been recognized that items such as salaries, traveling expenses, rent, and advertising which would ordinarily be currently deductible may be capital in nature when they are made for the cultivation or development of business, the benefits of which will be realized in future years. See X-Pando Corporation, 7 T.C. 48 (1946). Expenditures incurred in developing a new market or channel of distribution have long been held to be capital expenditures. Goodell-Pratt Co., 3 B.T.A. 30 (1925); see also Colonial Ice Cream Co., 7 B.T.A. 154 (1927). Petitioner argues that its drugstore *230 solicitation program was a program of advertising the expenses of which were ordinary and necessary business expenses. It has long been recognized that a solicitation program and the advertising relating thereto may constitute a capital expenditure. In Northwestern Yeast Co., 5 B.T.A. 232, 237 (1926), it was stated: There can be little doubt in the minds of reasonable men fairly acquainted with modern business that promotion expenditures like those before us have a significance similar to the investment in more tangible assets. They fertilize the field for new production. * * * Generally and theoretically, therefore, it is safe to say that some part of the cost of a campaign or system of promotion may be of permanent significance and may be regarded as a capital investment rather than a deductible expense. * * * Regardless of whether amounts expended by petitioner are designated as promotional expenses, advertising expenses or selling expenses, it is apparent that petitioner obtained *231 contracts which provided a channel of marketing distribution which would be a benefit to petitioner in future years. The benefits derived from contracts with the drugstore outlets were not merely incidental to income in future years but were instrumental in the production of such income. Cf. A. Finkenberg's Sons, Inc., 17 T.C. 973, 983 (1951). Petitioner argues that the expenses for the drugstore solicitation program were "ordinary" within the meaning of section 162(a), quoting from the Supreme Court decision in Commissioner v. Tellier, 383 U.S. 687, 689-690 (1966) the following: The principal function of the term "ordinary" in section 162(a) is to clarify the distinction, often difficult, between those expenses that are currently deductible and those that are in the nature of capital expenditures, which, if deductible at all, must be amortized over the useful life of the asset. * * * While advertising expenditures directed toward current sales of a taxpayer's product would be "ordinary" within the meaning of section 162(a) even though some lasting benefit *232 might be the incidental result of the advertising program, the factual situation in this case does not involve such advertising expenditures. The expenses incurred by petitioner in its drugstore solicitation program were not advertising directed at the promotion of its product but advertising directed at establishing new channels of distribution for that product and therefore would not be "ordinary" within the meaning of section 162(a).[2] Advertising and promotion directed at the solicitation of potential channels of distribution for the marketing of a product are directed toward creating a valuable asset which will be of 177 benefit to the business in future years. The contracts obtained which represent those channels of distribution constitute capital assets and the expenses incurred in obtaining them are capital expenditures. Houston Natural Gas Corporation v. Commissioner, 90 F. 2d 814 (C.A. 4, 1937), affirming 34 B.T.A. 228 (1936). *233 In numerous cases we have held that where a taxpayer purchases new outlets for the sale of its products, whether or not those outlets are acquired as a part of a going business, the asset acquired is a capital asset and the payment for acquiring the new outlets must be capitalized. See Manhattan Co. of Virginia, Inc., 50 T.C. 78 (1968). In the instant case petitioner acquired new outlets through its own efforts as distinguished from acquiring these assets by purchase. The fact that a capital asset is built or developed through the taxpayer's own efforts does not change the nature of the expenditures necessary to acquire the asset. See Ben Perlmutter, 44 T.C. 382 (1965), aff'd 373 F. 2d 45 (C.A. 10, 1967), in which we held a portion of overhead expenses, including officers salaries, other overhead salaries, depreciation, insurance, legal and audit expenses, office expenses, truck expenses, and costs of utilities to be allocable to the construction of shopping center buildings and required that the allocable portion of such expenses be capitalized. *234 See also Herbert Shainberg, 33 T.C. 241 (1959), in which we required similar expenses to be capitalized as part of the cost of buildings; Coors Porcelain Co., 52 T.C. 682, 696 (1969), aff'd 429 F. 2d 1 (C.A. 10, 1970), in which we held expenditures for alterations and changes in a machine not to be deductible as business expenses but to constitute nondeductible capital expenditures; and Red Star Yeast & Products Co., 25 T.C. 321, 341 (1955), in which we held research and development costs of a technique and process for the manufacture of the taxpayer's product were nondeductible capital expenditures.[3]
In the alternative, petitioner argues that only a portion of the expenses incurred are fairly allocable *235 to those contracts actually signed, and that only that portion which can be said to have been productive of signed contracts can be deemed to represent capital expenditures. [4] Petitioner asserts that the balance of expenses incurred in the year in issue was unproductive of anything that can be deemed to have had continuing value to petitioner, and is therefore fully deductible. We are unpersuaded by petitioner's alternative argument. The expenses incurred in generating leads and making telephone and personal contact with potential drugstore customers were part of an integrated effort to create another channel of distribution to compensate for the diminishing profitability of petitioner's retail sales outlets. Fragmentation *236 of the costs of creating that channel of distribution between productive contracts and unsuccessful efforts would not be reflective of the actual economic cost to "fertilize the field," the harvest from which will be reaped for years to come. See Manhattan Co. of Virginia, supra, at 86-87; Red Star Yeast & Products Co., supra at 340-41; and Hart-Bartlett-Sturtevant Grain Co., 12 T.C. 760, 767 (1949), aff'd 182 F. 2d 153 (C.A. 8, 1950). Finally, respondent argues that having concluded that the amounts expended by petitioner were in the nature of capital expenditures, the asset acquired had an indefinite life and petitioner would not be entitled to deductions for depreciation or amortization of the asset. Petitioner, in its reply brief, states that it agrees that "the duration of its relationships with a drugstore agency could not be determined at the time the relationship was established." Petitioner is therefore apparently making no alternative contention for an allowance of a deduction for depreciation or amortization. If this issue is still before us, we agree with respondent's contention. The contracts 178 acquired *237 by petitioner as a result of the drugstore solicitation program were for varying terms of years but each contract was automatically renewable on a year-to-year basis unless notice was given by either party to the contract within 30 days of the expiration of any such yearly period. The terms of these contracts were indefinite and in the absence of any showing that there was some reasonable basis for determining a reasonably useful life for the contracts, there can be no allowance of a deduction for exhaustion thereof. Thrifticheck Service Corporation v. Commisioner, 287 F. 2d 1, 4-5 (C.A. 2, 1961), affirming 33 T.C. 1038 (1960). Decision will be entered for respondent. Footnotes
1. All references are to the Internal Revenue Code of 1954.↩
2. We note that respondent's determination allocated the expenses of petitioner's franchise division for the taxable year ended June 30, 1962, between promotional expenses and recurring operating expenses. In the absence of proof that respondent's allocation is erroneous, it is presumed to be correct.↩
3. Red Star Yeast & Products Co., 25 T.C. 321 (1955), dealt with research and development of a type which, had the case been governed by the 1954 Code, might be of such a nature that a taxpayer could elect, under Sec. 174, I.R.C. 1954↩, to treat the items as deductible in the year expended. This, however, has no effect on the principle announced in the Red Star Yeast & Products Co. case.
4. Petitioner seeks to apportion expenses incurred for (1) generating leads, (2) telephone contact, and (3) personal contact by the ratio of the 159 productive contacts to the total prospective customers contacted in each category (50,000 potential drugstore customers as to lead generating expense; 2,000 potential drugstore customers contacted by telephone; and 600 potential drugstore customers contacted in person by sales personnel of the franchise division).↩