Los Angeles Towel Service Company, a California corporation v. Commissioner.
Los Angeles Towel Serv. Co. v. Commissioner
Docket No. 13581.
United States Tax Court
1949 Tax Ct. Memo LEXIS 76; 8 T.C.M. (CCH) 847; T.C.M. (RIA) 49228; September 14, 1949
*76 Respondent determined a portion of salary and bonus paid by petitioner to one of its officers to be in excess of reasonable compensation for services actually rendered. Held, under the facts, he committed no error in so doing. Petitioner acquired the business and equipment of some of its competitors and allocated part of the purchase price paid therefor to "commissions." Held, the amounts so designated were capital expenditures and not deductible as business expenses. Petitioner's alternative allegations present an inconsistent position within the meaning of section 734, I.R.C., and respondent is entitled to the adjustment provided for by that section. A. Calder Mackay, Esq., Adam Y. Bennion, Esq., and Paul E. Iverson, Esq., 215 W. Sixth St., Los Angeles, Calif., for the petitioner. R. E. Maiden Jr., Esq., for the respondent. ARNOLD Memorandum Findings of Fact and Opinion ARNOLD, Judge: This case involves deficiencies in income, declared value excess profits, and excess profits taxes for the years and in the amounts as follows: Declared Value
Income
Excess
Excess
Year
Tax
Profits Tax
Profits Tax
1940
$2,827.95
$ 832.63
$ 2,238.79
1941
4,906.25
3,542.20
11,015.93
1942
8,520.54
1943
916.48
32,052.40
By *77 amendment to his answer filed at the hearing the Commissioner seeks to increase the deficiency in declared value excess profits tax to the sum of $1,642.48 for 1943, and to increase the deficiencies in excess profits tax to the sums of $9,600.54 and $41,299.00 for 1942 and 1943, respectively. The issues are (1) whether the Commissioner erred in disallowing, as excessive compensation for 1940 and 1941, a portion of the salary and bonus paid by petitioner to one of its officers, Fred M. McGonigal; (2) whether the Commissioner erred in disallowing as expense deductions for 1940 to 1943, inclusive, certain portions of the amounts paid by petitioner at the time of the acquisition of new business. As an alternative to (2), if the Commissioner is sustained on the second issue, whether petitioner is entitled to increase its base period net income for 1939 by reason of similar deductions taken on its 1939 return. Petitioner abandoned the issue involving the reasonableness of salary and bonus paid W. R. Carter for 1942 and 1943. The returns for the taxable years were filed with the collector of internal revenue for the sixth district of California. Findings of Fact Petitioner, a Clifornia corporation, *78 is engaged in the linen supply business in southern California. It supplies offices, restaurants, factories, barber shops, beauty parlors, professional men, and others with towels and linens of all types. The linens are not sold to customers but are rented to them. After use petitioner's employees pick up the linens and towels and return them to petitioner's plant where they are laundered. A charge is made to the customer solely for the use of the linens and toweling owned by petitioner. Fred M. McGonigal was one of the incorporators of petitioner in 1913 and has been an officer and stockholder since its incorporation. McGonigal was experienced in the linen supply business, having been engaged in it for many years before 1913. He had interests in similar businesses in many parts of the United States. He enjoyed a reputation in the industry as one of its most able men. In 1940 and 1941 he was chairman of petitioner's board of directors and determined and supervised its business policies. He devoted no time to petitioner's day to day operations, which were conducted by W. R. Carter, its general manager, whom McGonigal had trained and brought into petitioner's organization in 1936. Changes *79 and innovations in petitioner's operation were initiated by Carter, with the support of McGonigal. Resistance to these changes by the prior management led McGonigal to notify the petitioner's president in 1937 that he was relieved of all responsibility for the operation of the business. During 1940 and 1941 McGonigal and Carter purchased cotton goods for petitioner. Through contacts that he had with various textile mills, McGonigal was able to make purchases at a substantial savings to the petitioner. He was also instrumental in securing the manufacture of a special type of material with a prolonged life, and in one instance secured for petitioner's exclusive use on the Pacific Coast a type of toweling unavailable to its competitors. He was constantly studying washing formulas, and the chemicals used in processing and cleaning textiles. He supervised and directed the washing formulas used and supervised the financial operation of petitioner. In 1940 and 1941 McGonigal resided in Atlanta, Georgia. He attended the meetings of petitioner's board of directors and was in Los Angeles two to four times a year. The length of his stay in Los Angeles varied from weeks at a time to a few days. *80 On his trips to and from Los Angeles McGonigal usually visited the other linen and towel supply companies in which he was interested. These companies, located in Wisconsin, New York, Washington, Ohio, Louisiana, and Texas, required less time and attention from McGonigal than petitioner, which had been growing rapidly since about 1936. McGonigal died September 26, 1941. The officers' compensation in relation to sales and net profits, after bonuses, of the petitioner for the years 1937 through 1943, were as follows: Officers' Compensation - In Ratio to Sales and Net Profit After Bonuses 1937
1938
1939
1940
1941
Sales
$284,187.88
$293,055.27
$318,580.02
$349,550.23
$439,231.27
Compensation
of officers: Salaries
11,605.00
17,540.00
19,620.00
16,500.00
15,075.00
Bonuses
16,758.62
25,045.78
30,407.14
29,303.70
19,350.00
Net Profit
after
bonuses
30,333.37
34,101.41
34,719.12
51,499.37
67,900.15
1942
1943
Sales
$541,954.92
$668,648.03
Compensation of officers:
Salaries
10,900.00
7,600.00
Bonuses
19,867.27
27,685.98
Net Profit
after
bonuses
81,187.78
107,068.71
The compensation of the officers of the corporation, including the salaries and bonuses to each, for the years 1937 through 1943, were as follows: COMPENSATION OF OFFICERS
Salaries
Name
1937
1938
1939
1940
E. C. Warner, Presi-
dent
$ 5,330.00
$ 5,400.00
$ 4,150.00
$ 2,400.00
F. M. McGonigal
Chairman of the
Board
2,700.00
2,700.00
3,950.00
5,700.00
A. H. Arnette, Secy.-
Treas.
3,575.00
3,600.00
3,600.00
3,600.00
W. R. Carter, Vice
President
3,500.00
4,800.00
4,800.00
D. W. Felsing, Vice
President
2,340.00
3,120.00
$11,605.00
$17,540.00
$19,620.00
$16,500.00
Bonuses
E. C. Warner, Presi-
dent
$ 8,379.31
$11,649.20
$13,821.43
$12,740.74
F. M. McGonigal,
Chairman of the
Board
8,379.31
11,649.20
13,821.43
12,740.74
W. R. Carter, Vice
President
1,747.38
2,764.28
3,822.22
$16,758.62
$25,045.78
$30,407.14
$29,303.70
Grand Total of Sala-
ries and Bonuses
$28,363.62
$42,585.78
$50,027.14
$45,803.70
COMPENSATION OF OFFICERS
Name
1941
1942
1943
E.C. Warner, Presi-
dent
$ 2,400.00
$ 600.00
F.M. McGonigal,
Chairman of the
Board
4,275.00
A.H. Arnette, Secy.-
Treas.
3,600.00
4,800.00
$ 1,600.00
W.R. Carter, Vice
President
4,800.00
5,500.00
6,000.00
D.W. Felsing, Vice
President
$15,075.00
$10,900.00
$ 7,600.00
Bonuses
E.C. Warner, Presi-
dent
$ 5,375.00
F.M. McGonigal,
Chairman of the Board
8,062.50
W.R. Carter, Vice
President
5,912.50
$19,867.27
$27,685.98
$19,350.00
$19,867.27
$27,685.98
Grand Total of Sala-
ries and Bonuses
$34,425.00
$30,767.27
$35,285.98
*81 The dividends paid by the petitioner for the year 1937 to the year 1943, were as follows: Dividends (Per Books)
1936 January 10
$20,000.00
December 10
4,000.00
$24,000.00
1937 January 21
$20,000.00
December 20
4,050.00
$24,050.00
1938 January 3
$20,250.00
December 15
12,450.00
$32,700.00
1939
$37,950.00
1940
38,700.00
1941
51,600.00
1942
17,200.00
1943
25,800.00
Stockholders of record of the petitioner for the years 1934 to April 7, 1942, were as follows: 1934 to
12-5-38 to
7-25-39 to
1-16-40 to
3-26-41 to
12-5-38
7-25-39
1-16-40
3-26-41
4-7-42
F. M. McGonigal
453
454
908
508
[1] 508
W. R. Carter
30
50
100
500
500
A. H. Arnette
1
5
10
10
[2] 18
Dan Felsing
5
5
10
10
[2] 2
Lillian F. Warner
75
75
150
150
150
S. W. McGonigal
90
90
180
180
180
Westervelt Terhune
40
40
80
80
80
Anna Douglas Seaman
38
38
76
76
76
H. B. Gay
32
32
64
64
64
C. N. Dannals
27
27
54
54
54
Mary S. Milone
16
16
32
32
32
Martha W. Dannals
13
13
26
26
26
Maude E. Seaman
10
10
20
20
20
R. A. Crawford
5
10
10
10
Total shares issued and outstanding
830
860
1,720
1,720
1,720
The minutes of a special meeting of petitioner's board of directors on January 16, 1940 show the following action relative to compensating McGonigal for *82 personal services actually rendered: * * *
Mr. Warner advised that during the past three years, namely, 1937, 1938 and 1939 certain bonus arrangements had been made by the corporation with three of its officers. These bonuses, in addition to certain basic salaries, had been paid during the respective years in consideration of valuable executive and administrative services rendered by the said officers, in addition to performing the duties of officers, all of which was productive of enhanced profits for the corporation. He further advised that he believed it proper to approve at this time the basis of bonuses contemplated to be paid to these officers during the calendar year 1940, in addition to certain basic salaries. It was moved, seconded and unanimously carried that a bonus of 20% of the cash profits earned by the corporation be paid during the year 1940 to E. C. Warner. Mr. Warner refrained from voting. It was moved, seconded, and unanimously carried that a bonus of 20% of the cash profits earned by the corporation be paid during the year 1940 to F. M. McGonigal. Mr. McGonigal refrained from voting. It was moved, seconded, and unanimously carried that a bonus of 6% of the cash profits *83 earned by the corporation be paid during the year 1940 to W. R. Carter. Mr. Carter refrained from voting. It was moved and seconded that when the actual cash profits earned by the corporation are determined during the year 1940, that the amount of bonus computed thereon and payable to each of the foregoing be then approved. * * *
At a meeting of petitioner's board of directors on December 2, 1940, the directors voted a cash dividend to stockholders in the sum of $17,200, and voted bonuses to Warner and McGonigal of $12,740.74 each, and a bonus of $3,822.22 to Carter. The minutes of a special meeting of petitioner's board of directors on January 8, 1941, show that the directors voted a cash dividend of $17,200 to stockholders and voted that "a bonus of 20% of the cash profits earned by the corporation be paid during the year 1941" to both E. C. Warner and F. M. McGonigal, and "a bonus of 8% of the cash profits earned by the corporation be paid during the year 1941" to W. R. Carter. The minutes of the directors' meeting of December 10, 1941 show the following action: It was moved, seconded and unanimously carried that the resolution voting a bonus to Mr. F. M. McGonigal and entered in *84 the minutes of the meeting of January 8, 1941, for the year 1941 be revoked as of this date and that the bonus terminate as of the close of the nine months' period ended September 30, 1941; and, it was further moved, seconded and unanimously carried that the bonus so voted shall amount to $8,062.50 for the said nine months' period ended September 30, 1941 and that it be paid to the Estate of F. M. McGonigal Deceased during the year 1941. The Commissioner disallowed the entire bonus paid to McGonigal during 1940 and 1941 in the respective amounts of $12,740.74 and $8,062.50, and allowed deductions merely for his basic salary of $5,700 and $4,275, respectively. A reasonable salary for the personal services actually rendered petitioner by McGonigal in the taxable years 1940 and 1941 is $5,700 and $4,275, respectively. During the taxable years petitioner expended the aggregate amount of $48,785.66 in the acquisition of assets of certain small competitors. The purchase price in each instance was allocated by petitioner's general manager, W. R. Carter, as follows: Depreciable
Total Cost
Linens
Commissions
Assets
1941
Citrus Belt
$ 6,773.50
$ 5,500.00
$ 508.50
$ 765.00
Nu Way Laundry
16,500.00
7,250.00
9,000.00
250.00
Ray Huckfeldt
500.00
300.00
200.00
1942
Franklin Supply
5,000.00
5,000.00
Advance Towel Service Co.
2,100.00
1,200.00
600.00
300.00
Thrifty Towel Service Co.
500.00
500.00
1943
Franklin Supply
5,200.00
4,900.00
300.00
Beverly Hills
12,212.16
10,000.00
1,000.00
1,212.16
Totals
$48,785.66
$34,650.00
$11,308.50
$2,827.16
Carter *85 was also petitioner's vice president until McGonigal's death, and thereafter was its president and general manager. He was thoroughly experienced and successful in the business conducted by petitioner. Before petitioner made an offer to purchase a competing business, Carter carefully examined the records of the competitor, analyzed the type of business being conducted, determined from the delivery records or laundry bills the quantity of linens and towels being processed, examined the shelf inventory to determine the quality and condition of the merchandise used to service its customers, and from the facts so ascertained fixed the price petitioner would offer for the business. The amounts allocated to linens and towels represented Carter's estimate of a fair and equitable allocation of the purchase prices to the merchandise acquired by the various purchases. Prior to March, 1942 petitioner charged its linen purchases directly to expense, but beginning in that month it adopted the proper accounting procedure of establishing a linen maintenance account. Purchases of linens, thereafter, were entered in that account and were amortized over the useful economic life of the linen, to-wit, *86 ten months. The amounts allocated to "commissions" in the above table, totaling $11,308.50, represented Carter's estimate of the amount it would have cost petitioner to acquire an equivalent volume of business through solicitation. During the years 1936-1939 petitioner spent considerable sums in soliciting and developing its own business, and its estimated cost of creating an added volume of $1.00 per month to its linen supply business was approximately $10. In 1939 petitioner decided, in order to more quickly expand its volume, to acquire the businesses of other companies, the acquisitions during the taxable years being set forth in the above table. The estimated monthly volume of business added by these purchases cost petitioner less than the volume added by its previous method of solicitation and development. By 1942 and 1943 new business could be obtained by telephone and competition for business had virtually ceased. The industry was concerned with obtaining scarce supplies and with gas rationing and price regulations. In the purchase of competing businesses during these years petitioner was more interested in the supplies of towels and linens and the mileage acquired than it *87 was in the additional accounts. Some of the accounts purchased were discontinued, while others were retained and less desirable accounts of the petitioner were discontinued. No use was made by petitioner at any time of the name of any of its competitors whose assets were acquired. On its income tax returns for the taxable years petitioner deducted, as expenses, the amounts allocated to linens and to "commissions" in the above table. The respondent disallowed the deductions and capitalized the amounts except for the allocations to linens and "commissions" in the Beverly Hills purchase in 1943 and the amount allocated to linens in the Advance Towel Service purchase in 1942. The amounts allocated to linens and "commissions" in the taxable years constituted capital expenditures. During October, 1939 petitioner acquired, in a similar transaction, a portion of the assets of one of the competitors listed above, namely, Franklin Linen Supply, for the sum of $11,102.16. Carter allocated $4,998.67 of the purchase price to linens and the balance of $6,103.49 to "commissions." On its 1939 return petitioner deducted the entire amount as expenses and the respondent allowed the deduction. Under *88 the proper accounting procedure adopted by petitioner in March, 1942 the linens should have been capitalized and amortized over their useful economic life of ten months instead of being charged off as expense. In computing petitioner's excess profits credit the unamortized portion of the linens purchased from Franklin Linen Supply, $3,499.07, should be restored to base period income for 1939. The amount of $6,103.49 allocated to "commissions" as a result of said purchase was a capital expenditure and this amount should be restored to petitioner's 1939 base period net income for excess profits tax purposes. The restoration of these amounts to petitioner's 1939 base period net income is inconsistent with the treatment accorded such items in its 1939 tax return, and the determination of a deficiency for 1939 is now barred except for the provisions of section 734, Internal Revenue Code. Opinion The first issue is whether the salary and bonus paid McGonigal can be deducted as reasonable compensation for the personal services actually rendered, under section 23, Internal Revenue Code. Petitioner contends that respondent allowed only meager sums for the services of a man of McGonigal's experience *89 and executive ability. It is contended that he was largely responsible for the excellent dividends distributed to stockholders after payment of all compensation to officers. Petitioner points to the net profits of $51,500 and $67,900 in 1940 and 1941, respectively, as compared with total officers' compensation of $45,800 and $34,400, respectively. The point is made that in a predominantly personal service business, the officers' compensation amounted to only 13 per cent of sales in 1940 and 7.8 per cent of sales in 1941. Petitioner asserts that bonuses had no relation whatever to stockholdings, were paid pursuant to resolutions adopted at the beginning of the respective years, prior to rendition of the services, and that this practice had been consistently followed for many years. Respondent finds cogent support for his determination in the fact that McGonigal resided in Atlanta; that he made only two to four visits to Los Angeles each year; that the entire responsibility of operating the business prior to and during the taxable years was vested in Carter; that McGonigal had not participated in the operational phases of the business for many years; that Carter initiated and effected *90 all policy changes, improvements and expansions in petitioner's business prior to and during the taxable years; that Carter and McGonigal purchased cotton goods for petitioner during the taxable years and prior thereto; and that McGonigal had other business interests in the taxable years to which he devoted a part of his time and from some of which he received compensation. Petitioner has the burden of showing what personal services McGonigal rendered to earn the compensation which it claims is deductible in each of the taxable years. We think petitioner has failed to carry its burden. To justify the claimed deductions of $18,440.74 and $12,337.50, petitioner must show what McGonigal actually did. It appears that he served principally in a supervisory capacity and as a purchaser of cotton goods for the petitioner. He lived in Atlanta and devoted no time to petitioner's daily operations. He did not purchase all of petitioner's cotton goods and his purchases were, according to the testimony, tied in with purchases for other similar businesses in which he was interested. Petitioner's tax returns indicate that its total consumption of towels and linens in 1940 and 1941 were $40,389.58 *91 and $67,017.25, respectively, and it is unlikely that its total purchases in each of said years exceeded the above amounts. Respondent contends that petitioner's purchases aggregated $40,260.08 and $54,348.33, respectively, but we have been unable to verify his figures. We are not persuaded that McGonigal's services were largely responsible for the profits realized by petitioner. Much credit must be given to Carter's personal services and to the personal services rendered by the other officers who participated in the daily conduct of petitioner's business. McGonigal evidently had great confidence in Carter's ability and supported him in his conduct of the business, but we cannot attribute to McGonigal the personal services actually rendered by Carter. The testimony given by Carter supports the inference that McGonigal gave only a part of his time solely to petitioner and that he spread his services among his various interests. Carter was asked, on cross-examination, to state briefly the actual services performed by McGonigal for petitioner during 1940 and 1941 and he testified as follows: Well, he acted as a contact man with the cotton mills in the purchase of cotton goods, he supervised *92 the operating policies of the business, he was instrumental in establishing washing formulas that we used in our operations, he was particularly valuable to the corporation for the economies effected in the purchase of cotton goods due to those contacts with cotton mills, in every phase of the business, selling, or operating, all the way through, he was very familiar and kept himself informed at all times on the operation of the business. Considering the time devoted to petitioner's interests as shown by the record, the long absences from petitioner's place of business, and the spread of his activities over the operations of similar businesses in many parts of the country, we are of the opinion that respondent's determination should be approved. Cf. Lydia E. Pinkham Medicine Co. v. Commissioner, (CCA-1) 128 Fed. (2d) 986, certiorari denied, 317 U.S. 675. The next issue requires a determination of the proper treatment for tax purposes of amounts expended by petitioner in the acquisition of assets of competitors. Our findings show petitioner's purchases during the taxable years and its allocation of the purchase prices to the assets acquired. No controversy exists with respect to *93 the aggregate amount of $2,827.16 allocated to so-called "depreciable assets." The dispute is over the deductibility of the remaining $45,958.50, which was allocated by petitioner, $34,650 to linens and $11,308.50 to "commissions." With respect to the linen item, the parties are agreed that the linens acquired by the purchases represent an asset exhaustible within a year, but respondent denies that the amount allocated to linen on each purchase was correct. Respondent contends that petitioner's allocations, both linen and "commissions," ignore the good will acquired, the list of customers purchased, and the increased volume of business acquired. He contends that these are capital items, not subject to amortization or depreciation. Petitioner relies upon Carter's allocations, which it contends are correct. We agree with petitioner with respect to the allocations made by Carter at the time of the purchase for the linens acquired. His testimony of the manner in which he determined the amount of the offer petitioner would make for a competitor's business and assets was convincing. The failure to take a physical inventory was not, in our opinion, fatal. He was sufficiently experienced in *94 the business to be able to determine from the shelf inventory, the quantity being cleaned and reconditioned, and the quantities delivered to, and in the hands of, customers the amount of linens and towels needed to supply the number and type of customers handled by the business. He was eminently qualified to allocate the purchase prices among the assets acquired, and he testified that he determined the amount to be allocated to linens, as follows: We take into account, in analyzing the type of accounts being served, whether it is linen supply service or towel supply service, the required number of articles of the different types, the type of business being served. From the volume of business that the man is doing, we are able to determine the required amount of linen to handle that volume of business, plus any surplus inventory that he may have, in addition to that in use. Carter further explained his allocations by stating the varying circumstances under which the purchases were made and the allocations determined. Respondent's counsel cross-examined him closely on the various transactions without creating any doubt in our mind as to Carter's capabilities or the reasonableness of *95 his allocations to linens. The claimed inconsistencies between petitioner's section 722 relief claims, which were introduced in evidence, and Carter's testimony is not apparent to us. And we can readily believe that, with the development of war shortages and the rationing of critical materials and supplies, petitioner became more concerned with maintaining its supply of linens, towels, soaps, etc., than in acquiring more customers. Petitioner's experience is entirely consistent with the experience of business generally during the war years. We cannot, however, agree with Carter's allocations to "commissions." In the first place the term "commissions" is a misnomer. Petitioner paid no commissions whatsoever, as that term is commonly understood. In this instance the term was used to represent an estimate of what Carter thought petitioner would have to pay out, based on past experience, if it developed the same volume of business by solicitation. Petitioner does not claim the "commissions" were actually paid or a debt created therefor. It claims that the amounts allocated to "commissions" are deductible current business expenses because they "are in lieu of commissions previously paid *96 to salesmen and should be similarly deductible." In our opinion the amounts allocated to "commissions" are capital expenditures. Petitioner argues that nothing was paid for good will or other intangible assets having an indefinite life. It points out that the use of the term "good will" in some of the contracts is not conclusive and fades into insignificance in the light of the testimony. It is unnecessary to comment at length on this argument. It clearly appears from the record that for one reason or another petitioner desired to purchase a portion or all of the business and assets of certain competitors. Whether we treat the amounts allocated to commissions as the cost of good will, customer lists, going concern value, or a combination of all three, the fact remains that petitioner paid the amounts claimed as "commissions" in order to acquire a part or all of the business and assets of competing firms. We hold that the "commissions" were capital expenditures, as determined by the respondent, and not deductible business expenses. The Peveley Dairy Co., 1 B.T.A. 385[1]. Petitioner's *97 further contention that if the "commissions are held to be capital expenditures, it should be allowed to amortize them over a four-or five-year period" is not well founded. We see no basis here for holding that the benefits of these purchases will be exhausted. Petitioner may continue to reap the benefits from the purchases indefinitely. Our determination of the second issue in favor of the respondent brings up the alternative issue raised by the amended pleadings. First, we shall consider the alternative issue raised in petitioner's amendment to its petition, and secondly, respondent's alternative issue raised in his amendment to answer to amendment to petition. Petitioner's alternative issue is whether respondent erred in determining the amount of its excess profits credit for each of the excess profits tax years before us, in that he failed to disallow similar deductions in 1939, a base period year. Petitioner alleges that disallowance of such deductions in 1939 would increase its average base period net income and its excess profits credit under section 713, Internal Revenue Code, and claim for such increased credit was made by petitioner. Respondent's position on petitioner's *98 alternative issue is stated in his amended pleadings as follows: * * * Respondent's primary position is that petitioner's income as shown on its return for the year 1939 and as accepted for the purposes of the excess profits credit in the notice of deficiency in income and excess profits taxes for the years 1940, 1941, 1942 and 1943 is the correct amount to be used for that year in computing its average base period income for the purpose of the excess profits credit. * * * This alternative issue must be decided in favor of the petitioner. We have repeatedly held that, in determining its excess profits tax liability, a taxpayer is entitled to use its correct net income in a base period year for the purpose of computing its excess profits credit. See Leonard Refineries, Inc., 11 T.C. 1000; Rosemary Manufacturing Co., 9 T.C. 851; Zellerbach Paper Co., 8 T.C. 511; and Carithers-Wallace-Courtenay, 5 T.C. 942. Respondent's regulations are to the same effect, for Regulations 112, section 35.734(2)-c states: * * * Either the Commissioner or the taxpayer, however, may insist upon the correct treatment of such item or transaction [incorrectly treated in determining taxpayer's income tax *99 liability for a prior taxable year] in the determination of the excess profit credit. * * * In his amended pleading respondent injects section 734 of the Code into the case for the first time. He alleges that petitioner is attempting to maintain an inconsistent position within the meaning of section 734 when it contends that in computing average base period income for purposes of its excess profits credit, 1939 net income should be increased by the amounts disallowed as linen and "commission" expense. He alleges that the determination of a deficiency against petitioner for 1939 is barred by the statute of limitations except for the provisions of section 734. And if his primary contention is determined adversely to him, respondent alleges, in the alternative, that he is entitled to an adjustment under section 734 to the extent of petitioner's additional income tax due on its increased 1939 income. Petitioner admits the respondent's allegations in its reply. The pertinent provisions of section 734 are set forth in the margin. [2] *101 *102 Application thereof to the facts proved and admitted convinces us that an adjustment should be made under section 734. There is no doubt that petitioner's excess *100 profits credit (under its alternative issue) was determined by treating the items inconsistently with the manner in which they were treated in determining petitioner's income tax liability for the base period year 1939, subsection 734 (b) (1) (A). Likewise, the treatment of such items in 1939 consistent with our determination of petitioner's excess profits tax liability in the taxable years will result in an increase in the amount of income taxes previously determined for 1939. Subsection 734 (b) (1) (B). And on the date petitioner's excess profits tax liability is determined, correction of the effect of the inconsistent treatment is barred by the statute of limitations. Subsection 734 (b) (1) (C). The conditions and restrictions set forth in section 734 (b) (2) are fully met if it is remembered that the position that respondent maintained, i.e., the items should be capitalized, related to petitioner's excess profits net income and not to its excess profits credit. The adjustment with which section 734 is concerned is one where an inconsistent position is adopted with respect to the excess profits credit and a base period year income *103 tax liability. Respondent capitalized the items in question in determining petitioner's excess profits tax liability for the taxable years, but in so doing he made no change in the treatment accorded these items for purposes of the excess profits credit. The first inconsistent position taken with respect to base period treatment and excess profits credit treatment of these items occurred when petitioner set up its alternative allegations in its amendment to the petition. If sustained in its alternative position, petitioner would be treating the items inconsistently for excess profits credit purposes from the treatment accorded such items on its 1939 income tax return. The inconsistency of its alternative position is admitted by petitioner, as well as respondent's right to an adjustment under section 734. The adjustment will be made under Rule 50. If, as a result of our decision, respondent is entitled, upon recomputation, to an increased deficiency, his claim therefor will be recognized. Decision will be entered under Rule 50. Footnotes
1. F. M. McGonigal died September 26, 1941 and stock held by his estate. ↩
2. These shares were acquired in 1942 by W. R. Carter.↩
1. See also Commercial National Insurance Co., 12 B.T.A. 655; Dime Bank of Lansford, Pa., 20 B.T.A. 250; U.S. Industrial Alcohol Co., 42 B.T.A. 1343, 1345↩.
2. SEC. 734. ADJUSTMENT IN CASE OF POSITION INCONSISTENT WITH PRIOR INCOME TAX LIABILITY. * * *
(b)Circumstances of Adjustment. - (1) If - (A) In determining at any time the tax of a taxpayer under this subchapter an item affecting the determination of the excess profits credit is treated in a manner inconsistent with the treatment accorded such item in the determination of the income-tax liability of such taxpayer or a predecessor for a prior taxable year or years, and (B) the treatment of such item in the prior taxable year or years consistently with the determination under this subchapter would effect an increase or decrease in the amount of the income taxes previously determined for such taxable year or years, and (C) on the date of such determination of the tax under this subchapter correction of the effect of the inconsistent treatment in any one or more of the prior taxable years is prevented (except for the provisions of section 3801) by the operation of any law or rule of law (other than section 3761, relating to compromises), then the correction shall be made by an adjustment under this section. If in a subsequent determination of the tax under this subchapter for such taxable year such inconsistent treatment is not adopted, then the correction shall not be made in connection with such subsequent determination. (2) Such adjustment shall be made only if there is adopted in the determination a position maintained by the Commissioner (in case the net effect of the adjustment would be a decrease in the income taxes previously determined for such year or years) or by the taxpayer with respect to whom the determination is made (in case the net effect of the adjustment would be an increase in the income taxes previously determined for such year or years) which position is inconsistent with the treatment accorded such item in the prior taxable year or years which was not correct under the law applicable to such year. (3) Burden of Proof. - In any proceeding before the Board or any Court the burden of proof in establishing that an inconsistent position has been taken (A) shall be upon the Commissioner, in case the net effect of the adjustment would be an increase in the income taxes previously determined for the prior taxable year or years, or (B) shall be upon the taxpayer, in case the net effect of the adjustment would be a decrease in the income taxes previously determined for the prior taxable year or years.↩