**METROPOLITAN LAUNDRY CO., Limited, v. UNITED STATES.**

No. 29272.

United States District Court
N. D. California, S. D.

Oct. 16, 1951.

804

Thomas, Beedy, Nelson & King, San Francisco, Cal., for plaintiff.

Theron Lamar Caudle, Asst. Atty. Gen., Andrew D. Sharpe, Leland T. Atherton, Sp. Assts. to Atty. Gen., Chauncey Tramutolo, U. S. Atty., Macklin Fleming, Asst. U. S. Atty., San Francisco, Cal., for defendant.

GOODMAN, District Judge.

The sole issue in this action for the refund of income taxes is whether plaintiff suffered a deductible loss in 1943 when it abandoned its San Francisco laundry *routes* after the Government, in condemnation proceedings, took possession of its laundry plant. In claims for refund filed with the Collector of Internal Revenue at San Francisco on February 20, 1946, plaintiff asserted this loss as the basis for refund of the $1,599.05 in income taxes paid for 1943, and also, by virtue of the "carry-over" privilege, 26 U.S.C. § 122(b) (2), as the basis for refund of the $27,529.48 in income taxes paid for 1944. These claims were rejected by the Commissioner on November 7, 1947 on the ground that the loss was not deductible and this suit followed.

The circumstances upon which plaintiff seeks to predicate a deductible loss may be briefly stated. At the time of its organization in 1903, plaintiff acquired in exchange for shares of its capital stock the plants, equipment, and routes of eleven laundries —ten of them situated in San Francisco, and. one in Oakland, California. The cost value of the San Francisco laundry *routes* was $155,100. Subsequently plaintiff purchased two additional routes in San Francisco for $1,500, making a total investment in San Francisco laundry routes of $156,600. From 1903 to 1943, except for a period of suspension following the San Francisco fire in 1906, plaintiff continuously and successfully carried on its laundry business in San Francisco. In February of 1943 the United States took possession of plaintiff's San Francisco laundry plant for the use of the armed forces and instituted condemnation proceedings. Thereafter plaintiff and the United States agreed upon a lease of the plant at a monthly rental of $7,500, and the condemnation proceeding was thereupon dismissed. Upon the seizure of its San Francisco plant, plaintiff was forced to abandon completely its San Francisco laundry routes, although it continued to operate its Oakland plant and service its routes in Oakland. At that time plaintiff sold all of the delivery equipment used in San Francisco. Three years later, on March 1, 1946, the United States relinquished possession of the San Francisco plant and plaintiff immediately resumed its operation. A substantial portion of the laundry work performed at the plant thereafter was done for the army under contract. Although plaintiff attempted to regain its civilian business it was unable to build up sufficient volume and suffered substantial operating losses. Consequently, in December of 1949, it closed its San Francisco plant.

It is plaintiff's contention that its $156,600 capital investment in San Francisco laundry routes was completely lost in 1943 when the routes were abandoned; and that this loss is deductible under Section 23(f)

of the Internal Revenue Code, 26 U.S.C. § 23(f).[1]

In opposition, the United States urges that, in fact, plaintiff suffered no loss at all. It claims that the monthly rental which plaintiff received under the lease with the United States compensated for the abandonment of the laundry routes. But there is no evidence that the rental for the use of the plant did or was intended to reimburse plaintiff for the loss resulting from the abandonment of its San Francisco routes. Plaintiff did not desire to lease its plant. It fully recognized that it would be difficult to reestablish its San Francisco business, and made strenuous efforts to sell the plant outright to the United States. The lease and the rental offered were accepted only because the sole alternative, a condemnation suit, gave promise of no better arrangement.

Prior to 1945, the Supreme Court had not approved compensation for a condemnee for the loss of the going concern value of his business resulting from the taking of his physical properties.[2] Even under the holding in the more recent case of Kimball Laundry Co. v. United States, 1949, 338 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765, the United States would have been obligated to compensate plaintiff only for the value of the use of the laundry routes during the period of the lease. The Government would not have been liable for the total loss of the routes. It is clear that plaintiff was in no position to bargain for, and the monthly rental was not intended to include, compensation for the loss of the laundry routes.

The United States also insists that it is incumbent upon plaintiff to show that the routes which it lost in 1943 were the same routes which it purchased in 1903, if it is to deduct their cost value as a loss. This showing plaintiff has not attempted to make, but for the obvious reason that the make-up of the routes undoubtedly fluctuated through the years. However plaintiff's cause is not thereby defeated. For, in a tax sense, a capital asset in the form of a list of customers regularly subscribing for goods or services is not to be regarded as an aggregation of disconnected individual subscribers. Such lists have been treated as unitary structures irrespective of incidental fluctuations and alterations. Houston Natural Gas Corporation v. Commissioner, 4 Cir., 1937, 90 F.2d 814, natural gas consumers; Meredith Pub. Co. v. Commissioner, 8 Cir., 1933, 64 F.2d 890, magazine subscribers; Commercial National Insurance Co., 1928, 12 B.T.A. 655, insurance policyholders; Rose C. Pickering, 1926, 5 B.T.A. 670, newspaper subscribers; Appeal of The Danville Press, Inc., 1925, 1 B.T.A. 1171, newspaper subscribers. The gradual replacement of old patrons with new ones is not to be regarded as the exchange of old capital assets for new and different ones, but rather as the process of keeping a continually existing capital asset intact. And, expenditures in-

---

1. "§ 23. *Deductions from gross income.* In computing net income there shall be allowed as deductions:
   "(f) *Losses by corporations.* In the case of a corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise."

2. It has always been the federal rule that for the usual taking of the fee title to business property the government need compensate only for the market value of the property taken. No compensation need be made for consequential damages or expenses to the business. Mitchell v. United States, 1925, 267 U.S. 341, 45 S. Ct. 293, 69 L.Ed. 644; Bothwell v. United States, 1920, 254 U.S. 231, 41 S.Ct. 74, 65 L.Ed. 238. In more recent years, particularly during World War II, the federal government has, with increasing frequency, condemned short-term leasehold interests in property. In many instances, as in the present case, the interest taken does not represent the condemnee's entire interest in the property. When this is so the condemnee's opportunity to adjust to the taking is more restricted than it would be were his entire interest taken. But, it was not until its decision in United States v. General Motors Corp., 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311, in 1945, that the Supreme Court recognized that the obligation of the government is thereby increased. In that decision, and others that have followed, the Supreme Court approved awards for certain damages and expenses to a condemnee's business when the government takes only part of his interest in business property.

curred in replacing patrons are ordinary business expenses in the nature of upkeep costs, *not* new capital investments. Willcuts v. Minnesota Tribune Co., 8 Cir., 1939, 103 F.2d 947; Reuben H. Donnelley Corporation, 1932, 26 B.T.A. 107; Successful Farming Publishing Company, 1931, 23 B.T.A. 150; Commercial National Insurance Co., supra; Appeal of Gardner Printing Co., 1926, 4 B.T.A. 37. Hence, it is only necessary for plaintiff to show, as it has done, that in 1943 its capital investment in its routes remained intact; that is, that the value of the routes in 1943 equaled or exceeded the capital investment of $156,600.

The United States points out that large sections of San Francisco were laid waste by the fire of 1906, and that plaintiff temporarily suspended its operations at that time while reestablishing its plants, all of which had been destroyed. The Court is asked to assume from these facts that the laundry routes which plaintiff purchased in 1903 for $155,100 were wholly lost in 1906, and that the routes which plaintiff had in 1943 were established in their entirety thereafter. If this were true, plaintiff's San Francisco routes would have had in 1943 a deductible value of only $1,500, the amount paid for the two routes purchased after 1906. Plaintiff did not capitalize any other expenditures which may have been made after 1906 to obtain new route patrons. But there is no *evidence* that plaintiff's *routes* were, *in fact,* destroyed in 1906.

■ On the other hand plaintiff has established that it acquired in 1903 laundry routes having a value of $155,100. Although all of plaintiff's plants were destroyed in the fire of 1906, it resumed its business as soon as it could rebuild. When it did so, it still carried on its books, as part of its good will, these laundry routes at the cost value of $155,100. The routes were carried on plaintiff's books at that value until 1943. Plaintiff has demonstrated that in 1943 the actual value of its laundry routes exceeded this book value. To negate this prima facie showing, the Court is asked to notice or assume that plaintiff wholly lost the original investment in the routes as a result of the 1906 fire. This the Court cannot do. For it would mean the making of a finding of fact entirely upon the basis of speculation, surmise, and conjecture.

■ Although plaintiff has thus established the cost and value of an asset which has been lost, the United States further contends that the loss is not a deductible one because it is not evidenced by the necessary "closed and completed" transaction. Treasury Regulations 111, Section 29.23(e)–1 (26 C.F.R. 29.23(e)–1). The Government reasons that plaintiff's laundry routes constituted part of its good will, a business asset which, it has been recognized, cannot be disposed of separately from the business itself. Grace Bros. v. Commissioner, 9 Cir. 1949, 173 F.2d 170; Red Wing Malting Co. v. Willcuts, 8 Cir. 1926, 15 F.2d 626, certiorari denied 1927, 273 U.S. 763, 47. S.Ct. 476, 71 L.Ed. 879. Thus inasmuch as plaintiff did not completely withdraw from the laundry business at the time it abandoned its San Francisco routes, the Government concludes that its loss amounts to no more than a depreciation in value of its good will. Concededly, a mere depreciation in value is not a closed matter and is not deductible as a loss. Dick & Bros. Quincy Brewing Co. v. United States, 1929, 67 Ct.-Cl. 505.

■ It may be granted that good will cannot exist in the abstract, apart from a going business, and that, generally speaking, the good will of a business cannot be entirely disposed of or destroyed while the business continues. But certainly a going concern can dispose of its business in a particular area or in respect to a particular product or service along with the incident good will without abandoning its entire business. Hillside Dairy Co., 1944, 8 T.C.M. 847; Appeal of The Pevely Dairy Co., 1925, 1 B.T.A. 385; Cf. Stratton Grocery Co., 1927, 8 B.T.A. 317. So also, certain types of concerns can dispose of their business and good will apart from their physical properties. Dime Bank of Lansford, Pa., 1930, 20 B.T.A. 250. Cf. Acme, Palmers & De Mooy Foundry Co. v. Weiss, D.C.-N.D.Ohio 1927, 21 F.2d 492. (converse situation). And, in either instance, so long as the business and the good will disposed of may be assigned a distinct transferable

value, the transaction may properly be recognized, for tax purposes, as a closed one. The Reuben H. Donnelley Corporation, 1932, 26 B.T.A. 107. That good will is capable of being valued apart from the physical property of a business has often been acknowledged. See e. g. Washburn v. National Wall-Paper Co., 2 Cir., 1897, 81 F. 17; Hillside Dairy Co., 1944, 8 T.C.M. 847. In so far as Red Wing Malting Co. v. Willcuts, supra, is authority for the proposition that the loss of the good will of a business can only be recognized to the extent that it is reflected in the loss incurred upon the disposal of the tangible business property, it cannot be followed.

Plaintiff's good will which existed in the form of established laundry routes was not incident to plaintiff's plant or its location. When plaintiff abandoned its regular service over its routes and sold its delivery equipment, it abandoned the only business to which the good will of its route patrons was attached. Even if plaintiff had continued to operate its plant, the good will incident to its delivery service would have ceased to exist. But, of course, plaintiff could no longer operate its plant. It retained only the bare legal title to the plant with no immediate prospect of regaining possession. It completely withdrew from the laundry business in San Francisco. Its Oakland business, from the standpoint of operation and good will, was entirely distinct from its San Francisco business. In fact it was conducted under a different name. Thus the continuance of operations in Oakland is of no materiality.

There can be no real doubt that the good will incident to plaintiff's San Francisco delivery service suffered more than a mere diminution in value when plaintiff abandoned its routes in 1943. People were on the move during the years that followed, and plaintiff had no way of maintaining contact with its patrons. Former patrons who might have been solicited upon the resumption of business could not have been counted upon to abandon the laundry service they had secured in the meantime, whatever fond memories they might have had of the excellence of plaintiff's service. The *bare possibility,* which then existed,

that some day plaintiff might be in a position to reestablish its San Francisco business, and that the psychological ties built up through the years might induce some of plaintiff's former customers to renew their patronage, does not oppugn the conclusion that in 1943 the value of plaintiff's established routes was wholly lost. See United States v. S. S. White Dental Mfg. Co., 1927, 274 U.S. 398, 47 S.Ct. 598, 71 L.Ed. 1120.

█ Since it appears that plaintiff has established all of the elements of a deductible loss under Section 23(f) of the Internal Revenue Code, it is unnecessary to consider the alternative theory that the loss is deductible as a war loss under Section 127 (a) (1).

There remains the contention of the United States that although plaintiff may have an otherwise valid claim for a tax refund, the claim was waived by the settlement agreement entered into when plaintiff's plant was returned. By the terms of this agreement, plaintiff received $10,000 and title to certain improvements at the plant made by the United States. In return, the United States was released from its obligation under the lease to restore the plant to its original condition. This release was embodied in Clause 4 of the agreement which stated that: "the Lessor hereby remises, releases and forever discharges the Government, its officers, agents, and employees of and from any and all manner of actions, liability, and claims against the Government, its officers, agents, and employees which the Lessor now has or ever will have for the restoration of said premises or by reason of any other matter, cause of thing whatsoever particularly arising out of said lease and the occupation by the Government of the aforesaid premises."

█ The Government urges that this clause is broad enough to embrace the claims for tax refunds. But, such an interpretation fouls both logic and principle. The settlement agreement was the result of negotiations for a cash settlement in lieu of restoration of the plant to its original condition. The parties sought a settlement on the basis of the difference between the value of the improvements which the Gov-

ernment had made and the estimated cost of restoration. At the time the negotiations were in progress and when the agreement was signed, plaintiff had already filed its claims for tax refunds of nearly $30,-000. There is no evidence that these claims were ever discussed or considered during the negotiations. It is evident that both parties intended the agreement to cover those claims which might have arisen directly out of the government's occupancy of plaintiff's plant under the lease. And the agreement, supra, did so in unequivocal language. Furthermore, the condemning authority had no power to compromise or settle tax claims. Only the Commissioner of Internal Revenue has such jurisdiction. 26 U.S.C. § 3761.

Judgment will enter for plaintiff upon findings to be presented pursuant to the Rules.