BOND BILT CONSTRUCTION COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bond Bilt Constr. Co. v. Commissioner
Docket No. 7647-71.
United States Tax Court
T.C. Memo 1975-248; 1975 Tax Ct. Memo LEXIS 124; 34 T.C.M. (CCH) 1066; T.C.M. (RIA) 750248; July 28, 1975. Filed Robert B. Pierce and William I. Liberson, for the petitioner. James C. Lynch, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF *125 FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in the petitioner's Federal corporate income taxes: Year
Deficiency
1964
$61,037.37
1965
66,748.00 The issue to be decided is whether the petitioner is entitled to a deduction with respect to a claimed loss for the termination of certain contract rights in 1967. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioner, Bond Bilt Construction Company (Bond Bilt), was a Michigan corporation and had its principal offices in Oak Park, Mich., at the time of filing its petition in this case. It filed its Federal corporate income tax returns for 1964 and 1965 with the District Director of Internal Revenue, Detroit, Mich. Such returns were filed on a calendar year basis and income was computed by use of the accrual method of accounting. During the years 1964 through 1967, two brothers, Harry and Charles Granader, equally owned all of the stock of Great Lakes Lumber and Supply Company (Great Lakes). The Granaders had been associated with the home modernization business since 1945. They owned and operated several other similar *126 companies. Prior to 1964, they were familiar with all phases of the home modernization business, including the financing arrangements in the business. On May 22, 1964, the Granaders agreed to purchase the business (B.B.) owned by Moe D. Egren and operated as a sole proprietorship. Mr. Egren had been in the home modernization business since the 1930's. He conducted his business under several trade names, including Bond Bilt Garages and Bond Lumber Company, but Bond Bilt Construction Company was his principal business name. By 1964, B.B. was one of the largest home remodeling companies in the Detroit area. It had a good name and reputation resulting in repeat customers. The total purchase price for B.B. was $1,035,000, of which $255,000 was allocated for "the goodwill of Bond Bilt Construction Company, Bond Lumber Sales Company and all other assumed names" and $25,000 was paid for Mr. Egren's covenant not to compete. The portion paid for goodwill was not allocated among the several elements constituting goodwill. On June 1, 1964, Charles Granader, as president of Bond Bilt, signed an agreement with the National Bank of Detroit (National) providing that the bank would purchase the *127 installment notes acquired by Bond Bilt in its business. Such agreement was basically a continuation of B.B.'s agreement with National, with few changes. Mr. Egren had had a very good relationship with National, having sold over 85 percent of his notes to it, and he was a personal friend of National's vice president for installment loans. Bond Bilt's agreement provided that all notes sold to National would be purchased without recourse to Bond Bilt. B.B.'s reserve account was to be continued for Bond Bilt. The terms of the reserve account were based upon National's experience with B.B. National agreed to contribute to the reserve account 2 percent on all loans between $500 and $1,000 and 4 percent on all loans in excess of $1,000. If, after subtracting defaulted obligations, the reserve account exceeded a specified amount, the excess would be paid to Bond Bilt. The specified amount was based upon the following percentages of the outstanding obligations on the specified date: March 20, 1965, 2 percent; March 20, 1966, 2-1/2 percent; March 20, 1967, 3 percent; and March 20, 1968, and annually thereafter, 4 percent. Mr. Egren had received in 1964 $52,416.78 in reserve account distributions *128 under his agreement with National, although at least $19,831.91 of this amount resulted from his own payments to his reserve account. No "front-end" commissions had been paid to Mr. Egren, and none were to be paid to Bond Bilt under the June 1, 1964 agreement. On June 9, 1964, Charles Granader, as president of Bond Bilt, signed an agreement with the Public Bank of Detroit (Public) providing that such bank would also purchase the installment notes acquired by Bond Bilt in its business. Public was at that time a substantial bank in the Detroit area. Harry Granader was then a director of Public, and as such, had some influence over the approval of contractors' agreements with Public since such agreements were subject to approval by the board. Bond Bilt's agreement with Public differed from its agreement with National in that both Public and Bond Bilt were to contribute to the reserve account. An annual accounting of the reserve account would be made starting on June 9, 1966. If the reserve exceeded 5 percent of the total obligations outstanding, the excess would be paid to Bond Bilt. No front-end commissions were to be paid under this agreement. Mr. Egren had never done business with *129 Public. On June 16, 1964, Great Lakes organized and incorporated Bond Bilt. The Granaders transferred the assets of B.B. to it, and it thereupon took over the operations of B.B. Throughout the years 1964 through 1967, Bond Bilt continued to be owned by Great Lakes. During such years, Bond Bilt's business included making home improvements, building additions to existing structures, remodeling kitchens, and constructing garages. Sales were solicited through various advertising media, including television. Salesmen were employed to contact customers, to give estimates, and to make contracts with them. In the home modernization business in the Detroit area during the early 1960's, approximately 90 percent of the sales required financing. After the contract between the contractor and the customer was signed in a typical financed sale, the customer's credit statement was referred to a bank. If the bank accepted the customer's credit, a loan was authorized. The customer gave the contractor his installment note for the total amount which included the price of the job and the finance charges. The contractor then sold the note to a bank, receiving payment for the work performed. Favorable *130 bank relations were very important to contractors in the home modernization business. Because of the high volume of work done on credit, contractors found it advantageous to be able to sell their customers' notes to banks. Such an arrangement allowed them to receive immediate payment for the work performed. Since the notes were sold without recourse, the contractors were protected in the event that a customer defaulted on his note. Good banking relations were an important factor in the contractors' credit rating with their suppliers. Contractors without good banking relations found it difficult to remain in business. In the years from 1962 to 1967, there was fierce competition among banks in the Detroit area for the purchase of installment notes. In view of this competition, they began programs to attract new business. At first, they began a policy of making disbursements to contractors from reserve accounts. Previously, when contractors sold notes to a bank, they were required to pay a specified portion of each note into a reserve account to protect the bank in the event the customer defaulted on the note. Beginning in 1962, the banks commenced contributing to the contractors' reserve *131 accounts. In addition, if a contractor's customers had a lower default rate than estimated, the contractor received an annual distribution from his account. Later, due to the intense competition, practically all banks started paying "front-end" commissions to the contractors. The commission was a cash bonus for selling to the bank and was in addition to any distributions from the reserve account. The banks' agreements with the various contractors were generally standard in form. However, certain aspects of the agreement were modified to meet the requirements of the individual contractors. The size of the reserve account and the rate of contribution to it varied, depending upon the contractor's volume, experience, and history of defaults. During the portion of 1964 for which it was in existence, Bond Bilt sold most of its notes to Public. It received no distribution from the reserve account at National during 1964. However, it reported "finance income" of $86,905.83. Its accountant defined finance income as including both front-end commissions and distributions from the reserve accounts due to sales of installment notes. On July 28, 1965, Bond Bilt's agreement with National was *132 amended in two respects. The formula governing National's contributions to the reserve account was changed to provide that it would contribute: 1 percent of loans of 36 to 47 months; 2 percent of loans of 48 to 59 months; and 3 percent of loans of at least 60 months. In addition, National agreed to pay a front-end commission of 1 percent on loans of at least 12 months and 2 percent on loans of at least 24 months. During 1965, Bond Bilt sold 29 notes to National with an aggregate principal amount of $101,351, and received $396 in front-end commissions. Most of its notes were sold to Public. Bond Bilt reported finance income of $238,675.62 in 1965. On May 19, 1966, Bond Bilt's agreement with National was again modified to increase National's contributions to the reserve account and to increase the front-end commissions. However, Bond Bilt was to receive a distribution from the reserve account only if the account exceeded 6 percent of the total loans outstanding, and then, it was to receive only 50 percent of the excess. In October 1966, the Federal Deposit Insurance Corporation was appointed receiver and liquidator of Public. All its assets were sold, and its business operations *133 terminated. On September 29, 1967, the Circuit Court for Wayne County, Mich., found that Public had become insolvent, and Public thereafter terminated any further operations. Public's failure was one of the biggest bank failures since the 1930's. As a result of such failure, Harry Granader and Bond Bilt received very adverse publicity. Mr. Granader was accused of obtaining favorable treatment for his company from the bank. The resulting publicity had a substantial adverse effect on Bond Bilt's business. It reduced Bond Bilt's volume of new business and inhibited Bond Bilt's sale of installment contracts to other banks. However, Bond Bilt was able to continue to sell some installment notes to banks. In late 1966 and early 1967, National and other banks in the Detroit area terminated the practice of paying front-end commissions for a variety of reasons relating to the home modernization business. One important reason was a trend toward the use of Federal Housing Administration loans. Nothing specifically relating to Bond Bilt caused the change, but the failure of Public may have been a factor. The following table shows Bond Bilt's business with National from 1966 through 1969: *134 Number of
Amount of
Front-end Year
Loans
Loans
Commissions
1966
377
$1,176,023
$24,041
1967
240
552,236
640
1968
205
485,800
1969
76
216,983 Bond Bilt never received a distribution from its reserve account with National from 1964 through 1969. [1]
On its Federal income tax returns, Bond Bilt reported finance income from all sources as follows: Year
Finance Income
1966
$74,270
1967
29,906
1968
7,981
1969
4,040 The finance income in 1968 and 1969 was received from Afco Delta Corp. on substantially different terms than those in the prior bank agreements. Bond Bilt continued in the same business after 1967. It continued to use and advertise the name "Bond Bilt Construction Company," and continued to solicit work and enter into contracts with its customers. It also continued to *135 sell some of its customers' notes to banks and other financial institutions, although it had to hold many of such notes itself. In an unrelated controversy in 1967, the petitioner agreed to the Commissioner's determination of a tax deficiency of $143,563.48 for 1964 through 1966. In order to secure the Commissioner's approval of a deferred payment plan for discharging such deficiency, the Granaders were required to place their Great Lakes stock in escrow as collateral. In determining the value of Bond Bilt's assets, the revenue officer attributed no value to Bond Bilt's intangible assets. Bond Bilt deducted $255,000 for the loss of goodwill in both its financial statements and its 1967 Federal income tax return. It filed Form 1139 for a tentative refund as a result of the carryback of a net operating loss in 1967 to 1964 and 1965, and such refund was allowed. However, in his notice of deficiency, the Commissioner determined that the claimed loss of goodwill and refund were not allowable. OPINION The petitioner contends that in 1964, $255,000 was paid for the goodwill of B.B.; that most or all of this amount was paid for intangible assets consisting of the financing arrangements *136 with National and Public; that these arrangements became completely worthless in 1967; and that as a result, it is entitled to a deduction for the loss under section 165 of the Internal Revenue Code of 1954. [2] The Commissioner, on the other hand, contends that the arrangements with National and Public were not purchased assets with a basis and that the petitioner failed to show that the arrangements were clearly identifiable assets lost in a closed transaction. Section 165(a) allows a taxpayer to deduct "any loss sustained during the taxable year and not compensated for by insurance or otherwise." Section 1.165-2(a) of the Income Tax Regulations provides in part: A loss incurred in a business * * * arising from the sudden termination of the usefulness in such business * * * of any nondepreciable property, in a case where such business * * * is discontinued or where such property is permanently discarded from use therein, shall be allowed as a deduction * * * See Becker v. Anheuser-Busch, Inc.,120 F. 2d 403, 417-418 (8th Cir. 1941), cert. denied 314 U.S. 625 (1941); *137 Massey-Ferguson, Inc.,59 T.C. 220 (1972); Stanley Burke,32 T.C. 775 (1959), affd. 283 F. 2d 487 (9th Cir. 1960). The amount of the deduction is determined by the taxpayer's adjusted basis in the lost property. Sec. 165(b). It is well established that goodwill may be composed of separate and distinct intangible assets which may be treated separately for Federal tax purposes. Meredith Broadcasting Co. v. United States,405 F. 2d 1214, 1224-1225 (Ct. Cl. 1968); see Parmelee Transportation Co. v. United States,351 F. 2d 619 (Ct. Cl. 1965); Maurice A. Mittleman,7 T.C. 1162 (1946). When one of such intangible assets which is severable and identifiable is abandoned, the consequent loss is deductible. Massey-Ferguson, Inc.,59 T.C. at 225. The parties agree on these principles, and agree that the arrangements with National and Public were severable and identifiable; nevertheless, considering all the circumstances, we find that the agreement with National was not abandoned in 1967 and that Bond Bilt had no adjusted basis in the Public contract. Consequently, Bond Bilt *138 sustained no deductible loss in 1967. The petitioner's argument that the National contract became completely useless in 1967 is based upon the assumption that the contract was valueless once front-end commissions were no longer paid under the contract. However, as the petitioner urged, it derived several benefits from the arrangement with National. Since most of its customers were unable to pay cash for the work, credit arrangements had to be made for them. The arrangement with National filled that need and enabled Bond Bilt to receive immediate payment for the work. By obtaining immediate payment, it was able to discharge its obligations to its creditors. At the time Bond Bilt acquired the business from Mr. Egren, the arrangement with National did include the provision that Bond Bilt might receive some distributions from the reserve account; not until later was the arrangement modified to provide for the front-end commissions. In 1967, the only change in the arrangement with National was that the bank discontinued paying front-end commissions; in all other respects, the arrangement continued in effect. As we set forth in our findings of fact, Bond Bilt continued in 1967, 1968, *139 and 1969 to sell some of its notes to National, and the provisions relating to the distributions from the reserve account remained substantially unchanged. Throughout the years 1964 through 1969, Bond Bilt used the arrangement with National only to a limited extent. In 1964, it apparently sold few if any of its notes to National, and in 1965, a little over $100,000 worth of such notes were sold to National. In 1966, the sales exceeded $1,000,000; in 1967, they fell to a little over $500,000; in 1968, they fell to slightly under $500,000; and in 1969, they were slightly more than $200,000. Thus, the sales in 1967, 1968, and 1969 all exceeded the sales in 1964 and 1965. These facts show that the arrangement with National continued through 1967, 1968, and 1969. A deduction for a loss of an intangible asset is not allowable unless the asset becomes totally worthless and is completely abandoned. [A] deduction should be permitted where there is not merely a shrinkage of value, but instead, a complete elimination of all value, and the recognition by the owner that his property no longer has any utility or worth to him, by means of a specific act proving his abandonment of all interest *140 in it, which act of abandonment must take place in the year in which the value has actually been extinguished. * * * [Commissioner v. McCarthy,129 F. 2d 84, 87 (7th Cir. 1942), revg. 44 B.T.A. 417 (1941).] Such statement has been approved by this Court in Stanley Burke,32 T.C. at 780. See New York Sun, Inc.,27 T.C. 319 (1956), affd. per curiam 253 F. 2d 487 (2d Cir. 1958). Since the arrangement with National continued to provide a means for Bond Bilt to sell its installment notes and continued to hold forth the possibility of Bond Bilt receiving distributions from the reserve account, it is clear that the arrangement was not totally worthless in 1967 and that it was not abandoned by Bond Bilt in that year. See Reporter Publishing Co.,18 T.C. 86 (1952), affd. 201 F. 2d 743 (10th Cir. 1953), cert. denied 345 U.S. 993 (1953). In view of that fact, we need not decide whether Bond Bilt had a basis in the arrangement with National. Bond Bilt's contract with Public was terminated in 1967 by Public's insolvency. Its value to Bond Bilt was completely lost at that *141 time. However, the petitioner must establish a basis in the contract in order to establish its right to a deduction for the loss. Sec. 165(b); see Miller v. Commissioner,333 F. 2d 400 (8th Cir. 1964), affg. 39 T.C. 940 (1963). The petitioner's basis in the Public contract is determined by the amount the Granaders paid for it. See secs. 362 and 1012. Bond Bilt argues that a portion of the $255,000 paid Mr. Egren for goodwill was actually paid for the financing agreement with Public. However, Mr. Egren had no such agreement with Public and had no business relations with it. Since he had no arrangements with Public, it is impossible to conclude that the petitioner's agreement with that bank was purchased from Mr. Egren. The petitioner argues that the National agreement was a springboard and justification for the Public contract. Yet, no evidence proving a "springboard" theory was introduced by the petitioner, and even if such relationship had been established, we fail to understand on what theory the petitioner would be entitled to treat any part of the purchase price of the business as a basis of the arrangement with Public. Consequently, we conclude *142 that the petitioner has not shown that it had any basis in the Public contract. The petitioner contends that the bank financing arrangements should be treated in the same manner as a customer list, that the normal replacement of old customers by new customers is not regarded as an exchange of an old asset for a new and different one, and that the acquisition of the Public contract merely kept an existing asset intact. However, even if the bank arrangements were comparable to a customer list, the acquisition of the Public contract was not equivalent to "normal customer turnover." Customer lists may be treated as unitary structures that are unaffected by gradual fluctuation in their composition. See Metropolitan Laundry Co. v. United States,100 F. Supp. 803, 805 (N.D. Calif. 1951). Whereas, in the present case, the Public contract was acquired before Bond Bilt was incorporated and in business. Furthermore, it did not replace the contract with National which remained in effect. Bond Bilt merely acquired a new asset for which it has established no basis. Although not clearly articulated, apparently the petitioner also is asserting that a portion of the $255,000 paid *143 for the goodwill of B.B. was for the "financing operation." However, no creditable evidence was introduced to prove this contention. While the Granaders may have anticipated earning finance income and such possibility may have been a factor in their decision to purchase B.B., they did not demonstrate that the finance operation was an asset of B.B. which was separate and distinct from the agreement with National and which was purchased in 1964. Furthermore, in view of Bond Bilt's continued use of the agreement with National and continued receipt of finance income in 1967 and subsequent years albeit in substantially reduced amounts, the "financing operation," if it existed, did not become totally worthless in 1967. Finally, the petitioner argues that since the Commissioner determined that Bond Bilt's intangible assets were worthless in 1967 when a revenue officer valued its assets to determine the amount of additional security necessary to protect the Government's tax lien in an unrelated dispute, he cannot now dispute its claim for the loss of goodwill. However, the petitioner has not demonstrated that it has relied upon the Commissioner's determination to its detriment. See Automobile Club of Michigan v. Commissioner,353 U.S. 180 (1957). *144 Furthermore, we do not find the Commissioner's present position inconsistent with his prior determination since very different issues are involved in the two controversies. Valuation of intangible assets for purposes of providing security for the Government's tax claims involves different considerations than determining whether those intangible assets have become worthless for purposes of allowing a deduction under section 165, and such difference may justify different conclusions. Decision will be entered for the respondent.
Footnotes
1. National's records only indicate the total amounts of finance income paid to Bond Bilt each year. Such amounts could include both front-end commissions and distributions from the reserve account. However, the records also indicate that the reserve account never became large enough to require a distribution to Bond Bilt in any year.↩
2. All statutory references are to the Internal Revenue Code of 1954.↩